**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| DARIA CRAWFORD and AHMED ABDELHAMID, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | Civ. Action No. 1:20-cv-01539-CRC Civ. Action. No. 1:20-cv-01886-CRC |
| v. | ) ) | **ORAL ARGUMENT REQUESTED** |
| THE PRESIDENT AND DIRECTORS OF GEORGETOWN COLLEGE, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

STATEMENT OF THE CASE...............................................................................................2

LEGAL STANDARD.............................................................................................................5

ARGUMENT ..........................................................................................................................6

I.     Plaintiffs' Claim For Breach Of Contract Should Be Dismissed ...............................6

     A.     Plaintiffs Have Failed To Plead An Enforceable Contractual Obligation ..............6

     B.     Plaintiffs Have Failed To Allege Any Breach ......................................................11

     C.     D.C. Law Counsels Against Second-Guessing Educational Judgments...............14

II.     Plaintiffs' Other Causes Of Action Also Should Be Dismissed................................18

     A.     Plaintiffs Fail To State A Claim For Unjust Enrichment......................................18

     B.     Plaintiffs Fail To State A Claim For Money Had And Received ..........................19

     C.     Plaintiffs Fail To State A Claim For Conversion .................................................20

III.     Plaintiffs' Complaint Should Be Dismissed With Prejudice .............................................22

CONCLUSION.......................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*,
    357 F.3d 62 (D.C. Cir. 2004) ................................................................18

*Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*,
    885 F. Supp. 2d 156 (D.D.C. 2012) ......................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................5

*Atria v. Vanderbilt Univ.*,
    142 F. App'x 246 (6th Cir. 2005) .........................................................15

*Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    130 F. Supp. 3d 236 (D.D.C. 2015) ......................................................20

*Coburn v. Evercore Tr. Co., N.A.*,
    844 F.3d 965 (D.C. Cir. 2016) ...............................................................6

*Delaware, Dep't of Health & Social Servs., Div. of Medicaid & Medical
    Assistance v. U.S. Dep't of Health & Human Servs.*,
    272 F. Supp. 3d 103 (D.D.C. 2017) ......................................................19

*Democracy Forward Foundation v. White House Office of Am. Innovation*,
    356 F. Supp. 3d 61 ..................................................................................2

*Edwards v. Ocwen Loan Servicing, LLC*,
    24 F. Supp. 3d 21 (D.D.C. 2014) ..........................................................20

*He Depu v. Yahoo! Inc.*,
    306 F. Supp. 3d 181 (D.D.C. 2018) ......................................................18

*U.S. v. Kellogg Brown & Root Servs., Inc.*,
    800 F. Supp. 2d 143 (D.D.C. 2011) ......................................................18

*McClean v. Duke Univ.*,
    376 F. Supp. 3d 585 (M.D.N.C. 2019) ..................................................15

*McNamara v. Picken*,
    950 F. Supp. 2d 193 (D.D.C. 2013) ..................................................20, 21

*Hinson ex rel. N.H. v. Merritt Educ. Ctr.*,
    521 F. Supp. 2d 22 (D.D.C. 2007) ..........................................................6

*United States ex rel. Morsell v. Symantec Corp.*,
    130 F. Supp. 3d 106 (D.D.C. 2015) ...............................................................18

*Mosby-Nickens v. Howard Univ.*,
    864 F. Supp. 2d 93 (D.D.C. 2012) ........................................................... *passim*

*Plesha v. Ferguson*,
    725 F. Supp. 2d 106 (D.D.C. 2010) ...............................................................18

*Roe v. Loyola Univ. New Orleans*,
    2007 WL 4219174 (E.D. La. Nov. 26, 2007) .......................................................19

*Roe v. Saint Louis Univ.*,
    2012 WL 6757558 (E.D. Mo. Dec. 31, 2012) .....................................................15

*Roebling v. Dillon*,
    288 F.2d 386 (D.C. Cir. 1961) .......................................................................19

*Shinabargar v. Bd. of Trustees of Univ. of Dist. of Columbia*,
    164 F. Supp. 3d 1 (D.D.C. 2016) ......................................................................7

*Shulman v. Voyou, LLC*,
    251 F. Supp. 2d 166 (D.D.C. 2003) ...............................................................21

*Stevens v. Sodexo, Inc.*,
    846 F. Supp. 2d 119 (D.D.C. 2012) ..................................................................6

*Vince v. Mabus*,
    956 F. Supp. 2d 83 (D.D.C. 2013) ..................................................................22

**State Cases**

*4934, Inc. v. Dist. of Columbia Dep't of Emp. Servs.*,
    605 A.2d 50 (D.C. 1992) ..............................................................................18

*Alden v. Georgetown Univ.*,
    734 A.2d 1103 (D.C. 1999) ...........................................................................14

*Allworth v. Howard Univ.*,
    890 A.2d 194 (D.C. 2006) .............................................................................14

*Andre v. Pace Univ.*,
    655 N.Y.S.2d 777 (N.Y. App. Div. 1996) ..........................................................15

*Basch v. George Washington Univ.*,
    370 A.2d 1364 (D.C. 1977) ..................................................................... *passim*

*Beukas v. Bd. of Trs. of Farleigh Dickinson Univ.*,
    605 A.2d 708 (N.J. Super. Ct. 1992) ...............................................................13

*Brantley v. Dist. of Columbia*,
    640 A.2d 181 (D.C. 1994) ........................................................................14

*Chase Manhattan Bank v. Burden*,
    489 A.2d 494 (D.C. 1985) ........................................................................20

*Choharis v. State Farm Fire & Cas. Co.*,
    961 A.2d 1080 (D.C. 2008) ......................................................................21

*Eisele v. Ayers*,
    381 N.E.2d 21 (Ill. App. Ct. 1978) ..........................................................13

*Lucero v. Curators of Univ. of Mo.*,
    400 S.W.3d 1 (Mo. Ct. App. 2013) ...........................................................15

*Moss v. Wayne State Univ.*,
    2009 WL 4344193 (Mich. Ct. App. Dec. 1, 2009) ...................................19

*News World Commc'ns, Inc. v. Thompsen*,
    878 A.2d 1218 (D.C. 2005) ......................................................................18

*Paynter v. New York University*,
    319 N.Y.S.2d 893 (N.Y. App. Div. 1971) ...........................................15, 16

*Schiff v. AARP*,
    697 A.2d 1193 (D.C. 1997) ......................................................................18

*Varner v. District of Columbia*,
    891 A.2d 260 (D.C. 2006) ..........................................................................8

**Other Authorities**

Rule 12(b)(6) .....................................................................................................5

## INTRODUCTION

In March 2020, facing an unprecedented public health crisis, Georgetown University made the difficult decisions necessary to protect its campus community while maintaining its tradition of educational excellence that dates back to 1789.  After careful consideration, the University shifted to an online learning environment that allowed students to complete their semester safely and with their academic credits intact.  This transition, which required tremendous dedication and effort on the part of Georgetown's faculty and staff, was the result of the University's academic judgment about how best to educate its students.

This case is one of roughly 150 lawsuits brought challenging colleges and universities' responses to COVID-19.  In a consolidated amended complaint, Plaintiffs—an undergraduate who graduated after completing the Spring 2020 semester and a current law student—concede that the University was required to discontinue in-person teaching due to the pandemic and related District of Columbia governmental orders.  And they acknowledge that, rather than withdraw from the University, they completed the Spring 2020 semester online using the instruction and resources provided by the University.  Indeed, one Plaintiff received her degree on the timeline she had originally anticipated.  Still, they contend that the University owes them a refund for the semester.  Georgetown stands behind its decisions to protect its students and to continue their education under uniquely challenging circumstances, and the University is proud of the extraordinary efforts its faculty and staff took to ensure that students experienced as little disruption to their educations as possible.  No refund of tuition and fees is owed to Plaintiffs.

While these circumstances are unprecedented, the operative legal principles are well settled.  All of Plaintiffs' claims—for breach of contract, unjust enrichment, conversion, and money had and received—turn on the allegation that Georgetown failed to provide its students the education promised when the University transitioned to online learning.  But Georgetown did

not promise to provide in-person instruction under all circumstances, let alone link such a promise to the payment of tuition or fees.  Georgetown's agreements with its students make clear that tuition and fees are not refundable based on how students are taught or whether they are satisfied with their courses.  Plaintiffs' claims for unjust enrichment, money had and received, and conversion suffer from similar threshold deficiencies, not least that they are unavailable to a party who sues on an enforceable contract.  These clearly established legal principles require dismissal of the complaint.

District of Columbia law establishes that challenges to how universities offer instruction and grant degrees are not properly heard in court.  There is no way to avoid those decisions here: Plaintiffs' claims would require this Court to assess what quality of education Georgetown promised, what quality it delivered, and what dollar figure to assign to any difference.  Settled D.C. law provides that neither this Court nor a jury may answer such questions.  The case should be dismissed with prejudice.

## STATEMENT OF THE CASE

This lawsuit challenges Georgetown's efforts to protect the health and safety of its students while maintaining continuity in their education as a result of the COVID-19 public health crisis.  In early March, the novel coronavirus began to spread across the United States and the first case of COVID-19 was confirmed in Washington, D.C.[1]  On March 11, the World

---

[1]     *See* D.C. Department of Health Confirms First Coronavirus Case, Government of the District of Columbia (March 7, 2020), *available at* https://coronavirus.dc.gov/release/dc-department-health-confirms-first-coronavirus-case.  On a motion to dismiss, the Court may consider documents incorporated by reference into the complaint and may also take judicial notice of government documents from reliable sources.  *See, e.g.*, *Democracy Forward Foundation v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 69 n.5, 71 n.9 (D.D.C. 2019).

Health Organization declared COVID-19 a pandemic,[2] D.C. Mayor Muriel Bowser declared a

state of emergency,[3] and the D.C. Department of Health recommended that non-essential mass

gatherings be postponed or cancelled.[4]  That same day, Georgetown announced that, to ensure

the health and safety of its campus community and the continuity of its academic programs, it

had engaged in "the most careful consideration" and had decided that in-person classes would

shift to online learning beginning on March 16, after spring break.  *See* Dkt. 10, Corrected

Consolidated Complaint ("Compl.") ¶¶ 12, 33.[5]  While campus would remain open and "key

services [would] be available," students were strongly encouraged to return to their permanent

addresses to fight the spread of the virus.[6]  Georgetown's March 11 announcement thanked

members of the University community for their tireless work to respond to the ongoing public

health crisis, and it emphasized that this situation would require a change simply to *how* the

University would complete its spring semester, not *whether* it would carry on.[7]  On March 13,

the University confirmed that online learning would continue for the rest of the semester and

---

[2]     *See* WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 (Mar. 11, 2020), *available at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3]     *See* Government of the District of Columbia, Mayor Bowser Declares Public Health Emergency (Mar. 11, 2020), *available at* https://mayor.dc.gov/release/mayor-bowser-declares-public-health-emergency.

[4]     *See* Government of the District of Columbia, D.C. Health Advisory (Mar. 11, 2020), *available at* https://coronavirus.dc.gov/release/dc-health-advisory.

[5]     Letter from John D. DeGioia, *Announcing Our Transition to a Virtual Learning Environment* (Mar. 11, 2020), *available at* https://www.georgetown.edu/news/announcing-our-transition-to-a-virtual-learning-environment/ (referenced at Compl. ¶¶ 12, 33).

[6]     *Id.*

[7]     *Id.*

stated that it would soon share plans to help students moving out of residence halls.[8]  From

March 16 through the end of the Spring semester, University faculty taught classes online.  *See

id.* ¶¶ 12-13, 33-34.

As the Georgetown community moved together to online learning, students expressed

that they valued the efforts that University faculty and administration took to support them

during the transition.[9]  Plaintiffs, like the rest of the student body, continued to receive

instruction online and received full credit for the courses they took; moreover, Plaintiff Daria

Crawford completed her undergraduate degree and graduated on schedule.  *See* Compl. ¶¶ 19-20.

In addition to the significant time and effort it invested in making sure students could continue

their education uninterrupted, Georgetown made numerous other accommodations to ensure that

students could successfully navigate an undisputedly difficult time.  These efforts included

expanding pass-fail grading options for all students,[10] introducing new resources to facilitate

access to online services,[11] expanding access to curriculum- and research-based online library

---

[8]     *See* Letter from John D. DeGioia, *Extending Virtual Learning Environment through the End of the Semester* (Mar. 13, 2020), *available at* https://www.georgetown.edu/news/extending-virtual-learning-environment-through-the-end-of-the-semester/.

[9]     Letter from Robert M. Groves, *COVID-19 Update: Congratulations!  Two Weeks Completed!* (Mar. 27, 2020), *available at* https://www.georgetown.edu/news/covid-19-update-congratulations-two-weeks-completed/.

[10]     Letter from Robert M. Groves, *Revised Grading Policy for Spring 2020* (Apr. 2, 2020), *available at* https://www.georgetown.edu/news/revised-grading-policy-for-spring-2020/.

[11]     Letter from Randy Bass, *Accessibility Resources for the Virtual Learning Environment* (Apr. 6, 2020), *available at* https://www.georgetown.edu/news/accessibility-resources-for-the-virtual-learning-environment/.

materials,[12] and suspending all financial penalties and collection actions.[13]  Georgetown also offered students prorated refunds of housing and dining fees "for the portion of the semester when they will not be occupying their residence halls or utilizing their meal plans, following March 16."[14]

In a consolidated complaint brought on behalf of a putative class of individuals who paid Georgetown tuition and fees for the Spring 2020 semester, Plaintiffs seek a refund of tuition and fees allegedly paid for in-person instruction and use of campus facilities.  Compl. ¶ 40.  Plaintiffs claim that Georgetown (1) breached a contract to provide in-person education and services, *id.* ¶¶ 48-60; (2) unjustly retained their Spring 2020 semester tuition and fees, *id.* ¶¶ 61-66; (3) wrongfully exercised control over and intentionally interfered with their property rights by closing its campus to in-person instruction and related services, *id.* ¶¶ 67-74, and (4) wrongfully retained their money without providing in-person instruction and related services, *id.* ¶¶ 75-82.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff's allegations are assumed to be true, but they cannot simply recite the

---

[12]    Letter from Robert M. Groves, *COVID-19 Update: Georgetown University Library Goes Virtual* (Mar. 23, 2020), *available at* https://www.georgetown.edu/news/covid-19-update-georgetown-university-library-goes-virtual/.

[13]    Letter from David Green, *COVID-19 Update: Suspension of Financial Penalties and Collection Actions* (Mar. 31, 2020), *available at* https://www.georgetown.edu/news/covid-19-update-suspension-of-financial-penalties-and-collection-actions/.

[14]    Letter from Robert M. Groves & Geoffrey S. Chatas, *COVID-19 Update: Move-Out Process for Residential Life* (Mar. 13, 2020), *available at* https://www.georgetown.edu/news/covid-19-update-move-out-process-for-residential-life/.

elements of a cause of action and must be enough to raise a right to relief above a speculative

level.  *See Coburn v. Evercore Tr. Co., N.A.*, 844 F.3d 965, 968 (D.C. Cir. 2016); *Hinson ex rel.*

*N.H. v. Merritt Educ. Ctr.*, 521 F. Supp. 2d 22, 27 (D.D.C. 2007).

## ARGUMENT

## I.   PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT SHOULD BE DISMISSED

Plaintiffs do not ground their contract claim in a specific, identifiable promise.  Instead

they claim that language in Georgetown's Course Catalog and academic policies addressing the

importance of class attendance together give rise to an obligation to provide in-person instruction

and services.  But no such promise was ever made.  The cited language in various Georgetown

documents is exactly the kind of language that D.C. courts have held unenforceable.

Georgetown's agreements with its students instead prove that tuition and fee refunds are

not available.  Tuition for Plaintiffs' programs is linked to the credits a student receives, not the

format of instruction; the University retains discretion to change its programs; and students are

responsible for charges whatever the method of instruction.  And universities have discretion to

decide how to carry out their educational mission—disputes over issues such as how courses are

taught are outside the courts' purview.  Accepting Plaintiffs' attempt to cobble together a

purported contractual promise would require the Court to restrain Georgetown's discretionary

educational decision-making in a way that D.C. law prohibits.

### A.   Plaintiffs Have Failed To Plead An Enforceable Contractual Obligation

Plaintiffs fail to do the minimum necessary to plead a breach of contract—"indicate …

the specific terms of [the] alleged contract" that was breached.  *Stevens v. Sodexo, Inc.*, 846 F.

Supp. 2d 119, 125 (D.D.C. 2012); *see also Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93,

98 (D.D.C. 2012) (explaining that the burden is on the plaintiff to "allege sufficient facts to

demonstrate … the terms of the contract" (citing *Manago v. D.C.*, 934 A.2d 925, 927 (D.C.

2007)).  "[T]he relationship between a university and its students is contractual in nature," and "the terms set down in a university's bulletin become a part of that contract."  *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977).  But every word of a university bulletin does not state a contractual term.  Instead, because university bulletins "customarily contain a great deal of information concerning what the prospective student may expect when he or she enters the university community," the mere presence of certain language in a bulletin "is not enough to support a finding that the language amounted to a contractual obligation."  *Id.* at 1366-67.

"Whether a given section of the bulletin also becomes part of the contractual obligations between the students and the university … must depend upon general principles of contract construction."  *Basch*, 370 A.2d at 1366-67.  The caselaw establishes two requirements.  First, the obligation alleged "must be so definite in its terms … that the promises and performances to be rendered by each party are reasonably certain."  *Id.* at 1367 (internal quotation marks omitted).  Second, a plaintiff must also plausibly allege the university's intent to be bound by a particular statement.  *See id.* (evaluating whether "the University intended to bind itself" "in the context of a university bulletin"); *Mosby-Nickens*, 864 F. Supp. 2d at 99 (looking to language of student rules and regulations and related indicia to determine intent to be bound); *Shinabargar v. Bd. of Trustees of Univ. of Dist. of Columbia*, 164 F. Supp. 3d 1, 29 (D.D.C. 2016) (noting that student honor code was not an enforceable contract because it "lacks … an intent to be bound").

Language that merely "expresse[s] an expectancy" fails to satisfy either requirement.  *Basch*, 370 A.2d at 1368.  Because such language may involve "the types of words that preclude accuracy by their very nature," the alleged promises in such statements are not sufficiently defined, nor the resulting performance sufficiently certain, to create "a promise susceptible of

enforcement." *Id.* at 1367-68; *see also id.* ("It is well established that mere expectancy of a continued course of conduct is not enough, even in situations where the disappointment of expectations results in a heavy financial loss."). Similarly, language that merely "communicate[s] [the University's] expectations … to its students" does not reflect an intent by a university "to bind itself to the … provisions" containing such language. *Mosby-Nickens*, 864 F. Supp. 2d at 99; *cf. Varner v. District of Columbia*, 891 A.2d 260, 272 (D.C. 2006) ("Aspirational practices do not establish the standard of care which the plaintiff must prove in support of an allegation of negligence. … [T]o hold otherwise would create the perverse incentive for universities and their administrators to write their manuals in such a manner as to impose minimal duties upon universities in order to limit civil liability." (internal citation, alterations, and quotation marks omitted)).

Plaintiffs point to various sources they say obligate Georgetown to provide in-person instruction and services. None does. *First*, they point to academic policies at the Georgetown University Law Center stating that "[r]egular and punctual attendance at all class sessions is required" and that "[s]tudent participation is expected in all courses." Compl. ¶¶ 7, 54. But these policies do not concern in-person instruction at all: Attendance and participation are equally important for online and in-person classes. These policies thus do not plausibly promise instruction in person.

*Second*, Plaintiffs quote Georgetown's website, which purportedly "markets the Georgetown on-campus experience." Compl. ¶ 37. Plaintiffs quote statements that "[t]hrough lectures, small group projects, independent studies, office hours, internships and more, you'll leave Georgetown with the intellectual skills of perception, analysis, interpretation, and expression" and that "[y]our classwork will prepare you for the experiential learning that truly

sets Georgetown apart … while building your resume in the city where laws are made." *Id.* These statements are nowhere near sufficiently "definite in [their] terms" to give rise to an enforceable contractual obligation. *Basch*, 370 A.2d at 1367. A student who claimed to leave Georgetown without "the intellectual skills of perception, analysis, interpretation, and expression" from office hours or small group projects could not plausibly assert breach of contract. Nor could a student who did not believe he received "experiential learning," given the lack of any concrete definition of that term. And each aspect of academic life cited here— lectures, small group projects, internships, office hours, etc.—can be provided online, and was during the pandemic. No cited website language promises in-person instruction.

*Third*, Plaintiffs note that a student activity fee "fund[s] various activities throughout the year, including concerts, lectures, performances, discussion groups, recreational opportunities, and other co-curricular programs." Compl. ¶¶ 10, 21, 55. This statement too promises nothing definite. A fee that supports "various activities … *including*" things as amorphous as "recreational opportunities" and "other co-curricular programs," *id.* (emphasis added), does not "render[] … reasonably certain" the services provided in exchange for that fee. *Basch*, 370 A.2d at 1367. Even if Georgetown promised these specific activities, which it did not, nothing promises them in person—online lectures, discussion groups, and even concerts and performances have been commonplace during the pandemic.

*Fourth*, Plaintiffs look to the Course Catalog, which lists "the location (including the building and room number) in which courses would be held" and "allows students to search for courses to enroll in based on 'Instructional Method,' which includes an option for 'In Person.'" Compl. ¶¶ 5-6; *see also id.* ¶¶ 22, 52-53. But identifying a course's room number merely "expresse[s] an expectancy." *Basch*, 370 A.2d at 1368. The Course Catalog offers "information

concerning what the prospective student may expect when he or she enters the university community," not binding obligations. *Id.* at 1367; *see also Mosby-Nickens*, 864 F. Supp. 2d at 99. If building and room numbers were contractually binding, Georgetown could never relocate a class. No reasonable student would think—and no university would intend—that a class scheduled for Room 302 could not contractually be moved to Room 402. Nor does a search filter for "Instructional Method" somehow contractually promise that method, any more than the filter for "Aging and Health" promises those courses will not be cancelled if they are undersubscribed, or the filter for "Title" promises that courses will not be renamed. *See* Compl. ¶ 6. If "English 201: *Moby Dick*" is renamed "English 201: Melville's *Moby Dick*," a student cannot sue over it. And if the lecture class Chemistry 101 was undersubscribed and recast as a seminar with lab, no one would have any basis to sue. The Course Catalog expresses the University's expectancy for course offerings—it makes no promises.

*Finally*, Plaintiffs cite course syllabi listing course locations or stating that "[s]tudents are expected to attend all class meetings." Compl. ¶¶ 23, 54. Like the academic policies discussed above, statements encouraging attendance apply equally in person and online. And like the Course Catalog, syllabi identify expected locations, but do not promise them—otherwise a class could never change rooms. Students and the University could not have had that intent. These syllabi thus lend no support to Plaintiffs' claim of a contractual obligation.

In sum, Plaintiffs point to nothing plausibly creating an obligation to provide on-campus classes and experiences that is "definite in its terms" and that the University intended to be binding. Nor do Plaintiffs plausibly allege a contract-by-mosaic that strings together unenforceable individual statements into an unspoken, unwritten promise to provide in-person

learning—let alone a promise that links in-person learning to the amount charged for tuition or fees.

> **B.      Plaintiffs Have Failed To Allege Any Breach**

Plaintiffs' failure to plausibly allege a sufficiently definite and enforceable promise for on-campus learning suffices to require the complaint to be dismissed.  And as for what Georgetown's agreements with its students *do* provide, Plaintiffs have alleged no breach.  To the contrary, Plaintiffs received exactly what they bargained for during the pandemic:  They continued to consume the education provided by Georgetown, they received the course credits they were expecting, and they progressed toward (or achieved) the completion of their degrees.

The terms of Georgetown's agreements with its students appear in the Undergraduate Bulletin and the Law Center Handbook, respectively attached hereto as Exhibits A and B. *Basch*, 370 A.2d at 1366 (stating that "the terms set down in a university's bulletin become a part of that contract").  These documents make clear that (1) tuition is tied to the credits received and to the Georgetown's education-related costs, not the manner of instruction provided; (2) the University decides how to provide that education and how to compute tuition, and (3) students accept responsibility for payment whatever the manner of instruction.

*First*, the Bulletin and Handbook identify how to calculate tuition, and they do not link tuition to in-person instruction.  Rather, tuition is determined by the credits associated with the courses in which the student registers.  For most undergraduates, tuition tracks full-time status, which requires a certain range of credits; for part-time undergraduates, credit hours determine tuition directly.  *See* Exhibit A at 21.  So too for law students like Plaintiff Abdelhamid.  *See* Exhibit B at 140.  FAQs provided to students describe how the University *does* set tuition rates. Factors "include the true costs of delivering the education we value—including available sources of financial aid, projected costs for competitive faculty and staff salaries, student services,

compliance services, [and] technology updates." *See* Exhibit C, Georgetown University Office

of the Provost, *Balancing Needs and Tuition Rate-setting: FAQs for Undergraduate Students*

(January 2017).  Method of instruction is not a factor listed.[15]  Both Plaintiffs continued to take

Georgetown classes and received exactly the credits they expected, and Plaintiff Crawford

graduated on time with her undergraduate degree—and so they do not allege that Georgetown

failed to live up to its end of the parties' bargained-for exchange.

*Second*, both the Bulletin and the Handbook reserve to Georgetown discretion to shape

instruction and to set rates for tuition and fees.  The Bulletin states, for example, that

"Georgetown University reserves the right to change without notice the Undergraduate Bulletin,

including all rules, policies, fees, curricula, courses, graduation requirements, or other matters

contained therein."  Exhibit A at 2.  It also provides that "Georgetown University specifically

reserves the right to increase tuition and other fees without prior notice should conditions be such

that an increase is warranted."  *Id.* at 21.  Similarly, the Handbook states that "[t]he Law Center

reserves the right to change academic requirements and policies," Exhibit B at iii, and that

"[t]uition and fees are subject to change without prior notice," *id.* at 140.  The right to change

curricula necessarily includes the right to shift the manner of instruction.  And similarly, the right

to *increase* tuition and fees necessarily includes the right to keep tuition and fees the same.  This

---

[15]     The polices in the Undergraduate Bulletin and the Law Center Handbook addressing
tuition refunds where a student withdraws are also instructive.  The Bulletin provides that an
undergraduate like Plaintiff Crawford who withdrew from the University on March 11, 2020—
five days before the first Georgetown class was held online as a result of the pandemic—would
receive no tuition refund, even though he was not receiving any educational services at all (in-
person or otherwise).  Ex. A at 28-29.  For law students like Plaintiff Abdelhamid, the Law
Center Handbook says that no refunds are available for any withdrawal after February 18, 2020.
Ex. B at 149.  Plaintiffs cannot plausibly allege they were entitled to a more generous refund
policy where all their classes were conducted through semester's end (though in a different
format) and they obtained the course credit they expected.

reservation of rights precludes Plaintiffs' contract claims.  *See Beukas v. Bd. of Trs. of Farleigh Dickinson Univ.*, 605 A.2d 708, 708-09 (N.J. Super. Ct. 1992) (finding that university officials' reservation of right in university bulletins to eliminate any college within university subject only to giving adequate notification to its students precluded recovery under express contract theory); *cf. Eisele v. Ayers*, 381 N.E.2d 21, 26 (Ill. App. Ct. 1978) (where university catalog provided that tuition rates were subject to change "without notice" or "on short notice," students could not sue for year-over-year increases of tuition absent allegations of malice or bad faith).

Finally, the Undergraduate Bulletin states that "[b]y act of Registration, students accept the responsibility for charges of the entire semester, regardless of attendance in class and regardless of the method of payment used."  Exhibit A at 28; *see also id.* at 54.  And the Law Center Handbook provides that "[b]y the act of registration, class attendance, or participation in other activities associated with enrollment at Georgetown Law, the student accepts financial responsibility for charges assessed to his or her student account," including "those for tuition, mandatory fees, room, board, and fines."  Exhibit B at 145.  Plaintiffs undoubtedly accepted this responsibility—not only did they register for classes at the beginning of the semester, they continued attending and participating in classes once Georgetown made the decision to shift instruction online as a result of the pandemic.  These statements unequivocally require students to pay full tuition, without regard to the manner of instruction.

Taken together, the agreement's actual terms defeat Plaintiffs' demand that Georgetown refund their tuition and fees.  Plaintiffs accepted exactly what the Bulletin and other University documents promised them:  instruction resulting in credits towards a Georgetown degree.  Their breach of contract claim therefore must be dismissed.

### C.    D.C. Law Counsels Against Second-Guessing Educational Judgments

Reinforcing the conclusion that Georgetown never promised in-person instruction is a body of District of Columbia law cautioning courts to leave decisions about academic programs, the granting of course credit, and the issuance of degrees to educators.  Georgetown invested significant effort and resources into making and executing exactly these kinds of decisions as it determined how best to protect its students' health and safety and ensure the continuity of its students' educations in the face of the pandemic.

In D.C. and elsewhere, discretionary educational decisions are "left to the sound judgment of … professional educators."  *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1109 (D.C. 1999).  When courts are asked to "determin[e] whether a university has complied with its own rules or contract, … 'a court must be careful not to substitute its judgment improperly for the academic judgment of the school.'"  *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006) (quoting *Neiman v. Yale Univ.*, 851 A.2d 1165, 1172 (Conn. 2004)) (second alteration in original)).  Courts thus will not adjudicate the quality or value of the education a university provided.  As the D.C. Court of Appeals has explained, courts cannot make these assessments, given "(1) the lack of a satisfactory standard of care, (2) the 'inherent uncertainties' about the cause and nature of damages, (3) the 'potential it presents for a flood of litigation against schools,' and (4) the threat of 'embroiling the courts into overseeing the day-to-day operations of the schools.'"  *Brantley v. Dist. of Columbia*, 640 A.2d 181, 184 (D.C. 1994) (quoting *Ross v. Creighton Univ.*, 957 F.2d 410, 414 (7th Cir. 1992)); *see also Alden*, 734 A.2d at 1108 (D.C. 1999) (observing that the court had previously "declin[ed] to engage in judicial review of academic decision-making by educational institutions"); *Allworth*, 890 A.2d at 202 ("[C]oncepts

of academic freedom and academic judgment are so important that courts generally give deference to the discretion exercised by university officials.").[16]

This deference extends to both academic decisions and other facets of campus and university life, including fees assessed for non-curricular campus services, because ascertaining which university services are "educational" is itself an exercise in judgment that requires "inquir[ing] into the nuances of educational processes and theories."  *Roe v. Saint Louis Univ.*, 2012 WL 6757558, at *10 (E.D. Mo. Dec. 31, 2012), *aff'd*, 746 F.3d 874 (8th Cir. 2014).  As a result, where campus services are "integrally related to the educational process and to student wellbeing," claims over those services are beyond proper judicial determination.  *McClean v. Duke Univ.*, 376 F. Supp. 3d 585, 609 (M.D.N.C. 2019) (plaintiff's allegations that the university failed to provide her with counseling services it had advertised or promised were barred); *see also Roe*, 2012 WL 6757558, at *10 ("[I]t would require the Court to inquire into the nuances of what should be determined 'state of the art' physical training program.").

Courts have applied this doctrine to forbear from diverse educational disputes—including schools cancelling classes in a national crisis.  In *Paynter v. New York University*, 319 N.Y.S.2d 893 (N.Y. App. Div. 1971), a parent sought a tuition refund after New York University cancelled what remained of the semester after the Kent State shootings.  The appellate court reversed a

---

[16]     The case law is consistent across jurisdictions.  *See, e.g.*, *Andre v. Pace Univ.*, 655 N.Y.S.2d 777, 779 (N.Y. App. Div. 1996) ("To entertain a cause of action for 'educational malpractice' would require the courts not merely to make judgments as to the validity of broad educational policies—a course we have unalteringly eschewed in the past—but, more importantly, to sit in review of the day-to-day implementation of these policies." (quoting *Donohue v. Copiague Union Free Sch. Dist.*, 391 N.E.2d 1352, 1354 (N.Y. 1979))); *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 251 (6th Cir. 2005) (stating that claims are barred if they "challenge the adequacy of the education that Vanderbilt provided"); *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 8 (Mo. Ct. App. 2013) (Missouri courts have "emphasized that it is not [their] place to micromanage a university's daily operations" and that "universities must be allowed the flexibility to manage themselves.").

judgment for the parent, holding that "the court erred in substituting its judgment for that of the University administrators and in concluding that the University was unjustified in suspending classes for the time remaining in the school year prior to the examination period." *Id.* at 894. The court went on to note that "while in a strict sense, a student contracts with a college or university for a number of courses to be given during the academic year, the services rendered by the university cannot be measured by the time spent in a classroom." *Id. Paynter* thus shows that education cannot be evaluated mechanically, and universities have leeway, not subject to judicial review, to shape the educational process in response to extrinsic events.

Georgetown stands behind the quality and value of the education it delivered during the pandemic. Shifting instruction online was not as simple as flipping a switch: Ensuring that the entire Georgetown student body could continue receiving instruction online required an unprecedented investment of time, resources, and energy on the part of the University, its faculty, and its staff. The instruction offered by Georgetown satisfied its standards, and Georgetown granted course credit to students who completed their classwork online. Indeed, both Plaintiffs continued to receive instruction during the pandemic, both received academic credit, and one completed her degree. Plaintiffs ask this Court to second-guess Georgetown's judgment that the instruction it offered met the University's exacting standards and find that the credits Plaintiffs earned are somehow worth less than would otherwise have been the case. Plaintiffs do not allege that they paid for credits that they did not receive. They instead seek damages or disgorgement (*see* Compl. ¶¶ 59, 66, 74, 82) for tuition and fees paid "for services that have diminished in value or are not being provided at all." *Id.* ¶ 18; *see also, e.g.*, *id.* ¶¶ 14, 38, 56, 59, 65, 74.

Plaintiffs would therefore have the Court appraise the difference between an online and on-campus Georgetown semester.  Under settled D.C. law, courts do not make such assessments. The logic of this principle proves itself here.  What would the deliberations look like for the claims of a hypothetical English major:  Is an online discussion section in her World Literature class less valuable than pre-pandemic in-person sessions?  What about large lecture classes with less individual interaction?  If so, is it worth $1,000 less?  Or $2,000?  What if the student continues to use online library services, or if she never used the library in the first place?  Did the student's online coursework truly merit the credit toward her Georgetown degree?  Who's to decide besides Georgetown itself?

To answer these questions, the Court would have to make determinations that are outside the scope of judicial review[17] and that would invite unlimited judicial oversight of educational discretion.[18]  Under settled D.C. law, these claims should not proceed.

---

[17]    Plaintiffs do not avoid these problems by seeking "the pro-rated portion of tuition and fees, proportionate to the amount of time that remained in the Spring Semester 2020 when classes moved online and campus services ceased being provided."  Compl. ¶ 18.  Prorating tuition requires determining by what percentage they should be prorated.  Unless the Court were to find that the value of Georgetown's online courses is zero—not an allegation Plaintiffs themselves could even plausibly make, given that both received course credit and one graduated with her degree—choosing the proration percentage would still require the Court to answer all the questions above that other courts have found are not susceptible to judicial review.

[18]    The threat that litigation would proliferate is palpable.  If the Court entertained claims like Plaintiffs', what would prevent a student from suing for a partial tuition refund if the tenured professor listed as teaching a class in the university bulletin fell ill partway through a semester and her class was taught by a graduate student instead?  And what would stop a lawsuit from a student who believes her university's decision to change a course advertised in the bulletin as graded to pass/fail diminishes the value of her degree?  Or what about a lawsuit that seeks a pro rata refund every time classes are cancelled due to adverse weather?  This is a slippery slope on which this Court should not embark.

## II.  PLAINTIFFS' OTHER CAUSES OF ACTION ALSO SHOULD BE DISMISSED

### A.  Plaintiffs Fail To State A Claim For Unjust Enrichment

At the threshold, "there can be no claim for unjust enrichment when an express contract exists between the parties." *Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 69 (D.C. Cir. 2004).  Nor will an unjust enrichment claim lie when an "implied" contract covers the matter in dispute.  *Schiff v. AARP*, 697 A.2d 1193, 1194 n.2 (D.C. 1997).  Since Plaintiffs allege an express or implied contract, their unjust enrichment claim cannot proceed.

Nor can Plaintiffs plead unjust enrichment in the alternative.  An alternative unjust enrichment claim requires, "at the very least, an allegation that there is no valid contract."  *U.S. v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 160 (D.D.C. 2011).  Here, everyone agrees that an enforceable contract exists covering the subject matter.  The only dispute is its over terms.  Unjust enrichment cannot proceed in these circumstances.  *See id.*; *He Depu v. Yahoo! Inc.*, 306 F. Supp. 3d 181, 193-94 (D.D.C. 2018) (collecting cases); *United States ex rel. Morsell v. Symantec Corp.*, 130 F. Supp. 3d 106, 129 (D.D.C. 2015); *Plesha v. Ferguson*, 725 F. Supp. 2d 106, 112 (D.D.C. 2010).

In any event, Plaintiffs fail to plausibly allege unjust enrichment.  "Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust."  *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005).  At bottom, "the doctrine of unjust enrichment depends on whether it is fair and just for the recipient to retain the benefit." *4934, Inc. v. Dist. of Columbia Dep't of Emp. Servs.*, 605 A.2d 50, 56 (D.C. 1992).  This is where Plaintiffs' claim falls short.  They recite the claim's elements (Compl. ¶¶ 61-66) but allege no facts showing that Georgetown *inequitably* retained their tuition or fees.  They do not contend

that Georgetown used their tuition or fees for noneducational or improper purposes. Instead they admit that—consistent with the University's educational goals—they accepted online instruction, received credit for it, and made progress towards (or even received) their degrees. *See* Compl. ¶ 13. When a plaintiff benefits from the defendant's retention of the original benefit, that retention is not unjust, and the claim fails. *See Roebling v. Dillon*, 288 F.2d 386, 387 (D.C. Cir. 1961); *cf. Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, 885 F. Supp. 2d 156, 188-89 (D.D.C. 2012). This principle has been applied to bar claims like Plaintiffs' for refunds where universities have responded to crises by investing students' tuition and fee payments into students' education, even if the means of that education is not what students expected. *See, e.g.*, *Roe v. Loyola Univ. New Orleans*, 2007 WL 4219174, at *2-3 (E.D. La. Nov. 26, 2007) (where defendant law school closed due to Hurricane Katrina but allowed students to take classes at other law schools conditioned on payment of tuition to defendant, defendant was not unjustly enriched by retention of tuition because plaintiff "received full credit for the courses he took [at another law school] and, by receiving this credit, … was able to graduate and sit for the bar, on time, something to which he ascribes value"); *see also Moss v. Wayne State Univ.*, 2009 WL 4344193, at *2 (Mich. Ct. App. Dec. 1, 2009).

Apart from Plaintiffs' failure to allege its elements, the unjust enrichment claim should be dismissed under D.C. law foreclosing claims again a university's academic decision-making, discussed above. No court in the District of Columbia has ever permitted an unjust enrichment claim against a university for failure to provide an allegedly promised level or quality of education.

### B.     Plaintiffs Fail To State A Claim For Money Had And Received

"[T]he law of the District of Columbia makes no distinction between actions for unjust enrichment and for money had and received." *Delaware, Dep't of Health & Social Servs., Div.*

*of Medicaid & Medical Assistance v. U.S. Dep't of Health & Human Servs.*, 272 F. Supp. 3d 103, 114 (D.D.C. 2017); *see also Chase Manhattan Bank v. Burden*, 489 A.2d 494, 497 n.8 (D.C. 1985) (the two causes of action "are essentially the same").  Plaintiffs' claim for money had and received should be dismissed for the same reasons as their unjust enrichment claim. Compl. ¶¶ 75-82.

### C.    Plaintiffs Fail To State A Claim For Conversion

Plaintiffs' conversion claim fails for four independent reasons.

*First*, conversion claims for money must identify specific funds, not a general obligation to pay money.  *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 130 F. Supp. 3d 236, 258 (D.D.C. 2015); *McNamara v. Picken*, 950 F. Supp. 2d 193, 195 (D.D.C. 2013) (plaintiff must allege that defendant put "*those exact funds*" to an improper purpose).  The complaint does not.  *See* Compl. ¶¶ 67-74.  Plaintiffs allege only that they "have an ownership right to the in-person educational services they were supposed to be provided in exchange for their Spring Semester 2020 tuition and fee payments to Defendant."  *Id.* ¶ 69.  But a claim for "a refund or credit for an overcharge … fails to state a claim for conversion."  *Campbell*, 130 F. Supp. 3d at 259.  Tuition and funds are "fungible cash … that may not underlie a claim for conversion." *McNamara*, 950 F. Supp. 2d at 195 (dismissing conversion claim where plaintiff alleged only that he contributed to general accounts and that money from the general accounts was misdirected); *see also Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 31 (D.D.C. 2014) ("A conversion claim cannot stand where, as here, plaintiff is owed *at most* some unspecified, unidentified portion of a larger pool of funds." (emphasis in original)).  That is exactly the case here: "Tuition revenue is combined with other revenue such as fund-raising, gifts, grants and services revenue and then allocated to schools, departments and programs." Exhibit C.

*Second*, the conversion claim duplicates Plaintiffs' contract claims.  Both claims turn on the contention that Georgetown may not retain funds paid to it in exchange for unperformed services under a contract.  That is a contract claim—not a claim for conversion.  *See Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 n.13 (D.C. 2008) ("Failure by a contracting party to pay the contract price or debt … is not a conversion but merely breach of contract."); *McNamara*, 950 F. Supp. 2d at 195.

*Third*, Plaintiffs do not plausibly allege conversion because they acknowledge that Georgetown transitioned to online learning, enabling students to continue to avail themselves of University resources and services.  *See* Compl. ¶ 13.  To state a claim for conversion, Plaintiffs must allege that Georgetown diverted their funds "in denial or repudiation of [Plaintiffs'] right to" the disputed property.  *Shulman v. Voyou, LLC*, 251 F. Supp. 2d 166, 170 (D.D.C. 2003).  Plaintiffs make no such allegation.  Plaintiffs themselves continued to attend and participate in classes, received credit, and made progress toward (or completed) their degrees.  And, as discussed above, Georgetown made significant efforts to make the transition to online learning as seamless as possible.  Indeed, given the University's effort to continue students' education despite the pandemic, Plaintiffs can hardly allege that Georgetown used the money they paid for anything but its intended purposes.

*Finally*, the conversion claim fails because, like the contract and unjust enrichment claims, it invites the Court to insert itself into Georgetown's academic decision-making.  *See* Compl. ¶ 71 (conversion claim premised on allegation educational services provided by Georgetown "have diminished in value").  Because the Court cannot decide the conversion claim without engaging in the inquiries described above, the claim should be dismissed.

**III.     PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE**

Plaintiffs' complaint should be dismissed with prejudice.  Through consolidation, the complaint adds new allegations that did not appear in either of the original *Crawford* or *Student A* complaints—including, for the first time, allegations concerning Georgetown's course catalog and academic policies.  But these amended allegations still do not state a claim.  The problem is not with Plaintiffs' allegations, but with their legal theories.  Because amendment would be futile, dismissal should be with prejudice.  *Vince v. Mabus*, 956 F. Supp. 2d 83, 92 (D.D.C. 2013) (citing *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996); *Carty v. Author Sols., Inc.*, 789 F. Supp. 2d 131, 135-36 (D.D.C. 2011)).

## CONCLUSION

For these reasons, Plaintiffs' complaint should be dismissed in its entirety with prejudice.

Dated: September 21, 2020

Respectfully submitted,

*/s/ Jamie S. Gorelick*
Jamie S. Gorelick (#913384)
Bruce M. Berman (#333948)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel.: (202) 663-6006
jamie.gorelick@wilmerhale.com
bruce.berman@wilmerhale.com
danielle.conley@wilmerhale.com

Alan E. Schoenfeld (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 937-7294
alan.schoenfeld@wilmerhale.com

*Attorneys for Defendant The President and
Directors of Georgetown College*