IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DARIA CRAWFORD and AHMED** | ) | |
| **ABDELHAMID, individually and on** | ) | |
| **behalf of others similarly situated**, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | Civ. Action Nos. 1:20-cv-01539-CRC |
| v. | ) | 1:20-cv-01886-CRC |
| | ) | |
| **THE PRESIDENTS AND DIRECTORS** | ) | |
| **OF GEORGETOWN COLLEGE,** | ) | |
| | ) | |
| *Defendant.* | | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS**

## TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND...................................................................................... 3

ARGUMENT .............................................................................................................. 5

I.    PLAINTIFF STATES A CLAIM FOR BREACH OF CONTRACT ............................... 5

      A.    The Consolidated Complaint Establishes An Enforceable
            Contractual Promise ..................................................................................... 5

      B.    The Consolidated Complaint Alleges An Actionable Breach .............................. 11

II.   PLAINTIFF DOES NOT ALLEGE EDUCATIONAL MALPRACTICE ...................... 17

III.  PLAINTIFF STATES A CLAIM FOR UNJUST ENRICHMENT ................................ 27

      A.    Plaintiff May Plead A Claim For Unjust Enrichment In The
            Alternative................................................................................................... 27

      B.    Plaintiff Sufficiently Pleads The Elements Of Unjust Enrichment ..................... 30

IV.   PLAINTIFFS STATE A CLAIM FOR MONEY HAD AND RECEIVED ................... 32

V.    PLAINTIFFS STATE A CLAIM FOR CONVERSION ................................................. 32

CONCLUSION........................................................................................................... 37

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*ABA, Inc. v. D.C.*,
  40 F. Supp. 3d 153 (D.D.C. 2014) ........................................................ 30

*Alden v. Georgetown Univ.*,
  734 A.2d 1103 (D.C. 1999) .......................................................... 18, 19

*Allworth v. Howard Univ.*,
  890 A.2d 194 (D.C. 2006) affirmed.................................................. 19

*Ansari v. New York University*,
  1997 WL 257473 (S.D.N.Y. 1997)................................................... 23

*Baker v. Capital City Mortg. Corp.., No. CV 09-2202 (RBW)*,
  2011 WL 13244133 (D.D.C. Dec. 28, 2011).................................... 28

*Baltimore v. District of Columbia*,
  10 A.3d 1141 (D.C. 2011) ............................................................... 32

*Basch v. George Washington, Univ.*,
  370 A.2d 1364 (D.C. 1977) ..................................................... passim

*Beukas v. Bd. Of Trs. Of Farleigh Dickson Univ.*,
  605 A.2d 708 (N.J. Super. Ct. 1992) ............................................... 13

*Bloomgarden v. Coyer*,
  479 F.2d 201 (D.C. Cir. 1973)........................................................... 7

*Brantley v. D.C.*,
  640 A.2d 181 (D.C. 1994) ..................................................... 17, 19, 21

*Bregman v. Perles*,
  747 F.3d 873 (D.C. Cir. 2014) ........................................................ 30

*Bucheit v. PLO*,
  2003 U.S. Dist. LEXIS 26002 (D.D.C. Aug. 15, 2003) ................... 33

*Busby v. Capital One, N.A.*,
  932 F. Supp. 2d 114 (D.D.C. 2013)................................................. 36

*Cambodia, Zumbrun v. Univ. of S. Cal.*,
  23 Cal. App. 3d 1 (Ct. App. 1972).................................................. 23

*Campbell v. Nat'l Union Fire Ins. Co.*,
  130 F. Supp. 3d 236 (D.D.C. 2013).......................................... 34, 35

*Cannon v. Wells Fargo Bank, N.A.*,
  926 F. Supp. 2d 152 (D.D.C. 2013)................................................ 33

*Cavaliere v. Duff's Bus. Inst.*,
  605 A.2d 397 (1992) ................................................................................... 17

*CenCor, Inc. v. Tolman*,
  868 P.2d 396 (Colo. 1994) .......................................................................... 23

*Chase Manhattan Bank v. Burden*,
  489 A.2d 494 (D.C. 1985) ........................................................................... 32

*Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*,
  82 F. Supp. 3d 344 (D.D.C. 2015) ............................................................... 30

*Cross v. Univ. of Toledo, No. 2020-00274JD*,
  2020 Ohio Misc. LEXIS 121 (Ct. Cl. July 8, 2020) ...................................... 25

*Davis v. Joseph J. Magnolia, Inc.*,
  640 F. Supp. 2d 38 (D.D.C. 2009) ............................................................... 30

*Delaware, Dep't of Health & Social Serv., Div. of Medicaid & Medical Assistance v. U.S. Dep't of Health & Human Serv.*,
  272 F. Supp. 3d 103 (D.D.C. 2017) .............................................................. 32

*Doe v. George Washington University*,
  305 F. Supp. 3d 126 (D.D.C. Apr. 25, 2018) .......................................... 10, 11

*Edwards v. Ocwen Loan Servicing, LLC*,
  24 F. Supp. 3d 21 (D.D.C. 2014) ................................................................. 33

*Eisele v. Ayers*,
  381 N.E.2d 21 (Ill. Ct. App. 1978) ............................................................... 13

*Falconi-Sachs v. LPF Senate Square, LLC*,
  142 A.3d 550 (D.C. 2016) ............................................................................ 29

*G-I Holdings, Inc. v. Baron & Budd*,
  238 F. Supp. 2d 521 (S.D.N.Y. 2002) .......................................................... 36

*Giles v. Howard Univ.*,
  428 F. Supp. 603 (D.D.C. 1977) .................................................................... 7

*Gov't of Rwanda v. Rwanda Working Grp.*,
  227 F. Supp. 2d 45 (D.D.C. 2002) ............................................... 32, 33, 34, 35

*Greene v. Howard University*,
  412 F.2d 1128 (D.C. Cir. 1969) ..................................................................... 7

*Greenlaw v. United States*,
  554 U.S. 237 (2008) .................................................................................... 20

*Harris v. Blockbuster Inc.*,
  622 F. Supp. 2d 396 (N.D. Tex. 2009) ......................................................... 15

*In re Antioch Univ.*,
  418 A.2d 105 (D.C. 1980) ........................................................................... 22

*Johnson v. McCool*,
    808 F. Supp. 2d 304 (D.D.C. 2011) ................................................................. 32

*Johnson v. Schmitz*,
    119 F. Supp. 2d 90 (D. Conn. 2000) ................................................................ 23

*Kashmiri v. Regents of Univ. of Cal.*,
    156 Cal. App. 4th 809 (Ct. App. 2007) ............................................................. 22

*Kramer Assoc., Inc. v. Ikam, Ltd.*,
    888 A.2d 247 (D.C. 2005) ............................................................................... 30

*Krukas v. AARP, Inc.*,
    376 F. Supp. 3d 1 (D.D.C. 2019) ...................................................................... 33

*Mawakana v. Bd. of Trustees of Univ. of D.C.*,
    113 F. Supp. 3d 340 (D.D.C. 2015) .................................................................... 7

*McClean v. Duke Univ.*,
    376 F. Supp. 3d 585 (M.D.N.C. 2019) ............................................................. 20

*McDermott v. Ohio State Univ., No. 2020-00286JD*,
    2020 Ohio Misc. LEXIS 127 (Ct. Cl. Aug. 24, 2020) ....................................... 25

*McNamara v. Picken*,
    950 F. Supp. 2d 193 (D.D.C. 2013) .................................................. 33, 34, 36

*Mellowitz v. Ball State Univ. & Bd. of Trs. of Ball State Univ.*,
    2020 Ind. Super. LEXIS 854 (Marion Sup. Ct. Civil Div. 14 Aug. 12, 2020) ........ 25

*Mosby-Nickens v. Howard Univ.*,
    864 F. Supp. 2d 93 (D.D.C. 2012) .................................................................... 10

*Nevius v. Afr. Inland Mission Int'l*,
    511 F. Supp. 2d 114 (D.D.C. 2007) .................................................................. 35

*Olsson v. Board of Higher Ed.*,
    49 N.Y.2d 408 (1980) ....................................................................................... 18

*Paladino v. Adelphi Univ.*,
    89 A.D.2d 85 (1982) ......................................................................................... 21

*Paynter v. New York University*,
    319 N.Y.S.2d 893 (N.Y. App. Div. 1971) ......................................................... 26

*Pride v. Howard Univ.*,
    384 A.2d 31 (D.C. 1978) .................................................................................... 7

*Regents of the Univ. of Mich. v. Ewing*,
    474 U.S. 214 (1985) .......................................................................................... 18

*Rinck v. Ass'n of Reserve City Bankers*,
    676 A.2d 12 (D.C. 1996) ................................................................................... 13

*Roe v. Loyola Univ. New Orleans*,
    2007 WL 4219174 (E.D. La. Nov. 26, 2007) .......................................................... 31

*Roe v. Saint Louis Univ.*,
    2012 WL 6757558 (E.D. Mo. Dec. 31, 2012) .................................................. 19, 20

*Ross v. Creighton University*,
    957 F.2d 410 (7th Cir. 1992) ............................................................................. 21, 22

*Rothberg v. Xerox Corporation,*
    2013 WL 12084543 (D.D.C. Jan. 4, 2013) .......................................... 16, 27, 28, 29

*Sabre Int'l Sec. v. Torres Advanced Enter. Solutions, LLC,*
    13 F. Supp. 3d 62 (D.D.C. 2014) .............................................................................. 35

*Salerno v. Fla. S. Coll.,*
    2020 WL 5583522 (M.D. Fla. Sept. 16, 2020) ........................................... 24, 27, 29

*Schulman v. Franklin & Marshall Coll.*,
    538 A.2d 49 (1988) ...................................................................................................... 7

*Scott v. District of Columbia*,
    101 F.3d 748 (D.C. Cir. 1996) ................................................................................... 28

*Shea v. Fridley*,
    123 A.2d 358 (D.C. 1956) .......................................................................................... 33

*Shulman v. Voyou, LLC*,
    251 F. Supp. 166 (D.D.C. 2003) ................................................................................ 36

*Sisco v. GSA Nat. Capital Fed. Credit Union*,
    689 A.2d 52 (D.D.C. 1997) ........................................................................................ 15

*Sloan v. Urban Title Servs.*,
    2011 U.S. Dist. LEXIS 31225 (D.D.C. Mar. 27, 2011) ............................................ 35

*Swartley v. Hoffner*,
    734 A.2d 915 (Pa. Super. Ct. 1999) .......................................................................... 18

*Tedeschi v. Wagner Coll.*,
    49 N.Y.2d 652 (1980) ................................................................................................. 18

*Zumbrun v. University of Southern California*,
    101 Cal.App. 3d 1 (1972) ........................................................................................... 26

**RULES**

Fed. R. Civ. P. 8(e)(2)................................................................................................... 36

Fed. R. Civ. P. 15(a) ....................................................................................................... 3

**OTHER AUTHORITIES**

Restatement (Second) of Contracts (1981) .................................................................................. 30

## **INTRODUCTION**

Beginning in March 2020, the COVID-19 global pandemic disrupted the daily lives of nearly all Americans, and certainly those in the Washington, D.C. metro area. Among the hardest hit were students, like Plaintiffs Daria Crawford and Ahmed Abdelhamed ("Plaintiffs"), who paid tens of thousands of dollars in tuition and fees to get an in-person educational experience, including all of the services, opportunities, and activities that come therewith, only to have that in-person experience ripped away. Students, like Plaintiffs, could have enrolled in one of the country's many online learning institutions – at a far cheaper cost – but opted to pay a premium for an in-person educational experience. Many students undertook significant debt to make these tuition and fee payments. Nonetheless, although it has an endowment of over $1.6 billion, Defendant Georgetown University ("Defendant") has refused to refund a penny of the tuition that students, like Plaintiff, paid for an in-person educational experience. As is clear from its Motion to Dismiss, Defendant believes that its students should bear all of the costs of the COVID-19 pandemic. *See* Defendant's Memorandum of Law (ECF No. 18-1) ("MTD"). The Court should not permit this inequity.

Defendant's attempts to avoid liability fail. Defendant first argues Plaintiffs have not identified the existence of a contractual promise for on-campus education, and even if such a promise existed, that Plaintiffs fail to allege a breach of that promise. MTD at 6-13. But Plaintiffs have established both. D.C. law recognizes that the relationship between a university and its students is contractual, with the terms of the contractual bargain defined by representations made in the school's catalogues, bulletins, and other enrollment or marketing materials. Here, the Consolidated Complaint alleges all elements of a breach of contract: existence of a contract, Plaintiffs' performance, Georgetown's breach, and resulting damages. *See* First Consolidated Amended Class Action Complaint (ECF No. 10) ("Consol. Compl.") ¶¶ 48-60. A review of Georgetown's Course Catalog, admissions materials, website, class policies, and long history of

1

prior dealings in totality lead to only one conclusion: that prior to COVID-19, Georgetown promised to provide on-campus in-person education, and that Plaintiffs and class members paid handsomely for and expected to receive the same.  *See id.*  ¶¶ 3-10, 19-20, 51-56.

Georgetown next argues its educational judgment should be granted special deference. MTD at 14-17.  That is simply not the law with respect to a university's commercial activities, and does not apply to any and all actions that may be brought against an educational institution as Defendant seems to suggest.  Universities are not entitled to judicial deference in transactions involving more than pure academic judgment.

Here, Plaintiffs' claims are plainly not academic in nature, but rather commercial, based on fundamental principles of contract law.  The Consolidated Class Action Complaint does not take issue with the specific ways that individual professors elected to teach their classes once remote learning was mandated.  Plaintiffs do not suggest, for example, that classes should have been taught differently online.  Rather, Plaintiffs and the putative class collectively paid millions of dollars to Defendant to purchase an on-campus educational experience with multiple benefits, services, experiences, and opportunities.  But once the switch to remote learning occurred, Plaintiffs were denied that experience for which they bargained and paid, including interaction with other students, the use of Defendant's infrastructure, buildings, libraries, labs, computers, etc. in the particular student's chosen discipline.  Plaintiffs, like all parties to a contract, are entitled to receive the benefit of their bargain.  The denial and deprivation of the rights, privileges, and in-person education that Defendant has afforded students for the past 231 years was a breach of contract between Plaintiffs and Defendant.

Simply put, Defendant did not provide Plaintiffs with the services that it marketed to the public in order to distinguish itself from other competitors, even though Plaintiffs bargained and

paid for them.   The law does not permit Defendant to retain the monies Plaintiffs paid. Unsurprisingly, an emerging body of court decisions in other COVID-19 university class actions has led to the rejection of schools' early attempts to dismiss claims similar to those asserted by Plaintiffs.  *See infra* at Section II (collecting cases).  Given the stage of the case and the applicable pleading standards, which require viewing Plaintiffs' well-pled allegations in their favor, Plaintiffs respectfully request that this Court deny Defendant's Motion in its entirety.  Should the Court be inclined to dismiss any aspect of Plaintiffs' claims, Plaintiffs request that the dismissal be without prejudice and with leave to amend in accordance with the liberal amendment standards inherent in Fed. R. Civ. P. 15(a).

## FACTUAL BACKGROUND

Defendant's Spring 2020 semester began on or about January 13, 2020 and concluded on or around May 9, 2020.  Consol. Compl. ¶ 11.  From March 11 2020 onward, Georgetown suspended in-person classes because of the global COVID-19 pandemic."  *Id.* ¶ 12-13. "Georgetown did not hold any in-person classes from March 6, 2020 through the end of the Spring 2020 semester.  Classes that [] continued after March 16, 2020 were only provided in an online format, with no in-person instruction."  *Id.* ¶ 13.  "As a result of the closure of Defendant's facilities, Defendant has not delivered the educational services, facilities, experiences, access, and/or opportunities that Plaintiffs and the putative class contracted and paid for."  *Id.* ¶ 14.  Thus, "Georgetown did not provide in-person education, experiences, or related services for approximately 50% of the Spring Semester 2020."  *Id.* ¶ 15.  "Nonetheless, Georgetown refuses to refund any tuition or mandatory fees for the Spring Semester 2020."  *Id.* ¶ 16.

"Plaintiffs and Georgetown entered into a contractual agreement where Plaintiffs would provide payment in the form of tuition and fees and Defendant, in exchange, would provide in-person educational services, experiences, opportunities, and other related services.  The terms of

the contractual agreement were set forth in publications from Georgetown University, including

Georgetown University's Spring Semester 2020 Course Catalog ("Course Catalog"), the

marketing materials, and Plaintiffs' acceptance letter." *Id.* ¶ 3.  That Course Catalog "provided

Plaintiffs and Class Members with information regarding the courses offered, the instructor, the

days and times during which the courses would be held, and the location (including the building

and room number) in which courses would be held."  Consol. Compl. ¶ 5 (screenshot).  "Indeed,

the Course Catalog specifically allow[ed] for students to search for courses to enroll in based on

'Instructional Method,' which includes an option for 'In Person.'":



Plaintiff Daria Crawford "was enrolled as a full-time undergraduate student at Georgetown

University during the Spring 2020 semester and graduated at the conclusion of the Spring 2020

semester." *Id.* ¶ 19.  "Ms. Crawford paid more than $16,000 in tuition and fees to Defendant for

Spring Semester 2020." *Id.*  "Plaintiff Ahmed Abdelhamid is a Georgetown law student who paid

tuition for the Spring 2020 semester." *Id* ¶ 20.  "Mr. Abdelhamid paid approximately $32,274 in

tuition and fees to Defendant for Spring Semester 2020." *Id.*  "Prior to beginning the Spring 2020

semester, and prior to paying tuition and fees, Plaintiffs consulted the Course Catalog and enrolled in courses for the Spring 2020 semester." *Id.* ¶ 22. "In consulting the Course Catalog, Plaintiffs understood and believed that every course in which they enrolled was to be taught in-person." *Id.* "Indeed, Plaintiffs' Spring 2020 semester schedule and syllabi, as exemplified on the Georgetown University student portal, show[ed] that each and every class in which [they] enrolled was to be taught in-person." *Id.* ¶ 23 (screenshot). "Plaintiffs' understanding and belief was based on the course specifying an on-campus location where the course would be taught, as well as that the courses were listed as "Instructional Method:  In Person" on the Course Catalog search function." *Id.* ¶ 22.

## ARGUMENT

## I.    PLAINTIFF STATES A CLAIM FOR BREACH OF CONTRACT

Defendant has moved to dismiss Plaintiffs' causes of action for breach of contract, asserting essentially two arguments.  First, Defendant contends that Plaintiffs fail to allege both a specific contractual promise and a breach of said promise.   Second, Defendant alleges that even if it breached the contract, it was at liberty to do so without repercussion.  Each of Defendant's arguments is without merit.

### A.    The Consolidated Complaint Establishes An Enforceable Contractual Promise

Defendant contends that "Plaintiffs fail to do the minimum necessary to plead a breach of contract – indicate… the specific terms of [the] alleged contract.'"  MTD at 6.  This is incorrect.

Breach of contract actions can sometimes trade in the minutia.  Parties may disagree as to the meaning of specific terms or the highly technical application of lengthy contracts written by lawyers and containing more Latin phrases than English ones.  This is no such case.  Plaintiffs do not seek to enforce some obscure provision buried deep within a university catalog.  This action

does not seek to overturn a disciplinary decision or poor performance assessment by latching onto a vague procedural statement in the student handbook.  Rather, this action contemplates one of the most fundamental and universally understood and accepted relationships ever existing between student and university, and one about which there has been no confusion since the first universities were established in this country dating back to the 1600's.  That is that when young adults "go off to college," there is indeed a campus to which they go to complete their studies.  The Merriam-Webster dictionary defines "university" as "an institution of higher learning providing facilities for teaching and research and authorized to grant academic degrees."

To be sure, in recent years, the concept of "online colleges" have grown in popularity among certain demographics.  Schools such as Strayer University and University of Phoenix have been quite successful in marketing their alternative form of education, which may appeal to individuals who, for example, wish to attend school while working full time, or desire to spread their education out over the course of several years.  Still, other students crave the true "college experience" – the quintessential game of frisbee on the quad – and traditional schools have spent billions of dollars on campus infrastructure to attract and retain those students.  Whatever the reason a particular student chooses a particular school, one thing is certain: when a student applies to university, she knows exactly what type of college experience she is signing up for, and it is exactly the one that university has spent millions of dollars promoting.  As the Superior Court of Pennsylvania recognized in 1988, "[a] college is frequently selected by parents and students because of the special aura or quality of life on campus that distinguishes it from other institutions."

*Schulman v. Franklin & Marshall Coll.*, 538 A.2d 49, 52 (1988).[1]

Notwithstanding these 400 years of historical context, Defendant argues that it is patently unreasonable for its students to expect an on-campus experience.  In the District of Columbia, the relationship between student and university is contractual in nature.  *Pride v. Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978) ("[A] contractual relationship exists between a university and its students.").  However, there is rarely an express, written, fully integrated contract.  Instead, that contractual relationship is in part implied and in part as set forth in the amalgamation of various documents, handbooks, catalogs, agreements, advertisements, and other publications.   In interpreting these writings, "the standard is that of reasonable expectation what meaning the party making the manifestation, the University, should reasonably expect the other party to give it." *Giles v. Howard Univ.*, 428 F. Supp. 603, 605 (D.D.C. 1977).  Likewise, the Court may consider the parties' course of dealing for the purposes of identifying the implied contractual terms. *Mawakana v. Bd. of Trustees of Univ. of D.C.*, 113 F. Supp. 3d 340, 347 (D.D.C. 2015) ("'An implied-in-fact contract ... differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt.'") (quoting *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C. Cir. 1973)).  Finally, "[i]t has been established that the usual practices surrounding a contractual relationship can themselves be raised to the level of a contractual obligation." *Pride,* 384 A.2d at 35 (citing *Greene v. Howard University*, 412 F.2d 1128, 1133 (D.C. Cir. 1969)).

---

[1] Ironically, courts made this observation in establishing the policy of judicial deference toward student disciplinary decisions (discussed more fully in Section II *infra*): the very deference Defendant erroneously seeks to extend to this case.

In short, the two overriding considerations are reasonableness of expectation and intent of the parties. "In ascertaining intent, we consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish." *Basch v. George Washington, Univ.*, 370 A.2d 1364, 1367 (D.C. 1977).

Here, Defendant has been providing on-campus education since its inception 231 years ago. As described in the Consolidated Complaint, Defendant's marketing campaign for its educational programs focuses almost exclusively on the school's location, its campus facilities, and the student experience it offers through its many clubs and events. Among other things alleged throughout the Complaint, Defendants' educational experience was purported to encompass face to face interactions with professors, mentors and peers, access to facilities such as libraries, laboratories, computer labs, and study rooms, student governance and student union access, extra-curricular activities such as groups and intramural sports, student art, cultures, and other activities, social development and independence, hands on learning and experimentation, and networking and mentorship opportunities. Consol. Compl. ¶ 38. The law school website explicitly advertises "clinics and externships that allow you to make an impact, while building your resume in the city were laws are made, Washington, D.C." *Id.* ¶ 37 (screenshot). Students register for classes through an online portal that provides them with information regarding the courses offered, the instructor, the days and times during which the courses would be held, and the location (including the building and room number) in which courses would be held. *Id.* ¶ 5. Most explicitly, when searching the Georgetown course catalog, students may filter by instructional method, and choose specifically between "Hybrid," "In Person," and "Online" courses. *Id.* ¶ 6 (screenshot). Plaintiffs attended in-person classes, and otherwise had access to

campus facilities and services, every day for the weeks and months leading up to the time that they were evicted from campus. *Id.* ¶¶ 28-34. The Catalog's description of fees is equally clear. The Student Activity Fee is defined as a fee designed to "fund various activities throughout the year, including concerts, lectures, performances, discussion groups, recreational opportunities, and other co-curricular programs." *Id.* ¶ 10, 21. No reasonable person paying tuition prior to COVID-19 could have believed anything other than that they were signing up for an on-campus, in-person education.

Defendant asks the Court to turn a blind eye to all of these assertions, including the overwhelming majority of its publications. Defendant separately argues that no express or implied promise is created by: (1) any of its academic policies requiring class attendance and participation (MTD at 8); (2) anything on its website (*Id.* at 8-9); (3) its student activity fee (*Id.* at 9); (4) any of the portions of its Course Catalog as cited in the Consolidated Complaint (*Id.* at 9-10); or (5) any of its syllabi (*Id.* at 10). The Court need not consider these arguments separately, however, when considering the totality of "the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish." *Basch*, 370 A.2d at 1367. While any one of these arguments might possibly be true, standing alone, the aggregate of these publications and interactions can lead to only one conclusion: that prior to COVID-19, the University promised to provide on-campus education, and the students paid handsomely for and expected to receive the same.

Instead, Defendants inexplicably contend that all of the University's statements to students regarding its in-person and on-campus experience were not "definite in their terms" and "merely express[ed] an expectancy." MTD at 7. This is incorrect. As noted above, Georgetown's statements created the specific understanding and the reasonable contractual expectation that

students who were paying tens of thousands of dollars each semester would receive an in-person and on-campus experience.  Consol. Compl. ¶¶ 3-10, 51-56.

Last, the two cases that Georgetown relies upon do not support their argument.  In *Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93, 99 (D.D.C. 2012), the district court found that certain rules and regulations appeared simply as "a means for the university to communicate its expectations regarding academic conduct to its students" rather than for the university to "bind itself to the provisions."  However, it is well-accepted in D.C. that "the terms set down in a university's bulletin" become part of the contract between students and the University." *Doe I,* 305 F. Supp 3d at 136 (citing *Basch*, 370 A.2d at 1367).  The promises Plaintiffs have identified here, which are accompanied by the specific references to in-person education outlined *supra* and in Plaintiffs' complaint, are a far cry from the University merely communicating expectations about academic conduct.  In addition, *Mosby-Nickens* was decided on summary judgment after full fact discovery, not a motion to dismiss, and the Plaintiff did not identify any rules or regulations constituting the contract until his response to the motion for summary judgment.  *Mosby-Nickens*, 864 F. Supp. 2d 93 at 98-99.

In *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366-68 (D.C. 1977), also relied upon by Defendant,  the state court held that the university did not contractually guarantee that tuition increases would not exceed $200 per year, where the bulletin stated that "[e]very effort will be made to keep tuition increases within these limits" but "circumstances may require an adjustment in this estimate."  The court found that "[r]ather than being definite, the pertinent words from the bulletin," – words like "estimated," "approximate," and "projected" – instead "expressed an expectancy by the University regarding future increases," which was "not a promise susceptible of enforcement." *Id*. at 1367-68.  Here, on the other hand, there was no hedging by Georgetown

in materials such as the Course Catalog regarding whether in-person on-campus courses would remain in-person and on-campus.  As noted in *Doe I*, the Court should view the language of the documents as would a reasonable person in the position of the parties.  *Doe I*, 305 F. Supp 3d at 133.  Plaintiffs' complaint sufficiently alleges there was a meeting of the minds regarding the provision of in-person on-campus education in exchange for tuition monies each semester, and that Georgetown intended to be bound by that promise.[2]

**B.      The Consolidated Complaint Alleges An Actionable Breach**

Defendant next argues that Plaintiffs have not plausibly alleged a breach of contract because they believe "Plaintiffs received exactly what they bargained for during the pandemic… the education provided by Georgetown… the course credits they were expecting, and… progress[ion] towards… the completion of their degrees.  MTD at 11.  This is incorrect.  Ironically, in making this argument, after having asked the Court to ignore nearly every other document and action, Defendant directs the Court to specific sections of its Undergraduate Bulletin ("Bulletin") and Law Center Handbook ("Handbook"), respectively found as Exhibit A and B to Defendant's MTD.  Defendant posits that because the two documents identify how tuition is calculated and do not link this calculation to in-person instruction, there is no way for Plaintiffs to tie tuition payments to a reciprocal promise of in-person and on-campus education.  MTD at 11-12.

However, the fact that tuition corresponds to the *number* of credit hours does not mean that it does not *also* correspond to other promises made by the University, including in-person and on-campus educational services *and the cost of credit hours for those services.*  To the extent that students *are* merely paying for credit hours, the *format* of instruction matters:  live credit hours are

---

[2] *See Basch*, 370 A.2d at 1367 ("In ascertaining intent, we consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties, and the purposes which they sought to accomplish….").

not equivalent to online credit hours.[3]   Georgetown deflects by pointing out that "method of instruction is not a factor listed" in calculation of tuition charges.  However, there is a simple and obvious explanation for this.   Georgetown, like Plaintiffs and the putative class, did not contemplate the possibility of *anything but* in-person and on-campus education in such calculations because as defendants have themselves admitted, "these circumstances are unprecedented."  MTD at 1.  The reason that method of instruction is not specifically listed is because  all parties understood, based on Georgetown's history, literature, and marketing, that in-person and on-campus education would be provided.

Defendant next points to an alleged reservation of discretion to shape instruction and to set rates for tuition and fees.  However, their argument is inconsistent with both the language of its reservation provisions and the cases it relies on.  The Georgetown Undergraduate Bulletin vaguely purports to "reserve[] the right to change without notice the Undergraduate Bulletin, including all rules, policies, fees, curricula, courses, graduation requirements, or other matters contained therein," while the Handbook similarly states that the Law Center "reserves the right to change academic requirements and policies."  MTD at 12.  Both of these reservations are red herrings. This case involves changes made during *the middle of a semester*, after the contract had already been formed, after students had already pre-paid tuition and fees, and after the deadline had passed for students to withdraw.  It is one thing to make changes from semester to semester, and Plaintiffs do not suggest that Defendant lacks authority to do so.  However, it is an entirely different matter to change the terms of the contract after one party has already fully performed.  Furthermore, sending every student home to take classes on Zoom is not simply a "change" in these areas:  it is

---

[3] As outlined *supra* and in Plaintiffs' Complaint.

a complete failure to provide the bargained for in-person on-campus educational experience. Reading the reservation as would a reasonable person in the position of the parties, as required by D.C. law and particularly on a motion to dismiss where all inferences must be drawn in Plaintiffs' favor, the only conclusion to be drawn is that Georgetown can change the courses it offers, but not the fundamental manner of delivery.  Again, no reasonable person would read the reservation to mean that after students paid full price for live classes and campus access, Georgetown could unilaterally provide only online classes.

Neither of the cases cited by Defendant stand for the proposition that such a reservation of right allows the University to unilaterally alter the contract *in the middle of the semester* after students have already fully performed under the contract by pre-paying tuition and fees.  Defendant relies upon *Beukas v. Bd. Of Trs. Of Farleigh Dickson Univ.*, 605 A.2d 708, 708-09 (N.J. Super. Ct. 1992), a case in which a dental program was discontinued between academic calendar years. Every student who had pre-paid tuition and fees for the final semester received that full semesters' worth of instruction and credit.  The students were merely required to transfer to a different school before beginning their next semester.  And in fact, the school went above and beyond by helping to arrange the transfers and offering to subsidize any differences in tuition. Defendant's reliance on *Eisele v. Ayers*, 381 N.E.2d 21, 26 (Ill. Ct. App. 1978) is equally misplaced, where the court held students could not sue **for year-over-year increases** of tuition absent allegations of malice or bad faith.  *Id.* (emphasis added).

These situations do not so much turn on the existence of the reservation clause, but on the doctrine of contract modification.  Parties are permitted to modify contracts where there is mutual assent.  *Rinck v. Ass'n of Reserve City Bankers*, 676 A.2d 12 (D.C. 1996).  In such cases, although the universities reserved the right to modify, they also satisfied the legal obligations for effecting

13

modification.  Specifically, the students who did not assent to modification were free to transfer without financial penalty.  By remaining enrolled, there was an implication of assent.  By contrast, Plaintiffs in this matter and those similarly situated had no such freedom in the face of Defendant's attempted modification.  They could not transfer or dis-enroll mid-semester because they had already pre-paid for the entire semester and Defendant's policies (as addressed in Section I(A) *supra*) provided for no refund upon withdrawal after the end of the fourth week of classes.  The Court cannot infer assent from Plaintiffs' and the classes' continued enrollment because they had literally no other option.

Georgetown next points to the policies in the Bulletin and Handbook regarding tuition refunds to argue that Plaintiffs are not entitled to a "more generous refund policy when their classes were conducted through semester's end (although in a different format)" because both undergraduate and law students withdrawing from the university on the date Georgetown first held online classes would receive no tuition refund even though they would not receive any educational services at all.   MTD at 12.  These refund policies have nothing to do with the case at hand.  Instead, the policies set forth the way that refunds will be handled only when students withdraw from courses.  As such, these policies contemplate a scenario where the student elects to break the contract.  Both speak nothing of what happens when the Defendant breaches the contract.

Defendant's argument as to students accepting responsibility for charges regardless of attendance in class and methods of payments used fares no better.  That the Bulletin and Handbook contain phrases stating that students "[b]y the act of registration" accept responsibility for charges is of no consequence.  Unlike the tuition refund policy, which is arguably part of the contract, albeit an inapplicable part, this policy is not contractual at all.  As *Basch* instructs, not every part of a university's bulletin becomes part of the contract.  Instead, "[w]hether a given section of the

bulletin also becomes part of the contractual obligations between the students and the university … must depend upon general principles of contract construction." *Basch*, 370 A.2d at 1367. Necessarily, to be an enforceable contractual provision, there must exist consideration and mutuality of obligation. *See, e.g.*, *Sisco v. GSA Nat. Capital Fed. Credit Union,* 689 A.2d 52 (D.C. 1997). While Defendant might be free to refuse fee refunds in the face of a student's withdrawal (the likely intent of this handbook provision), Defendant cannot apply this policy in the face of its own breach. A contract that provides no remedies is no contract at all. This is no more binding than a sign stating "all sales are final" on the McDonalds drive through board. While such a policy might apply where the customer changes her mind after ordering (perhaps she spots a Burger King across the street), the policy would not allow McDonalds to collect full payment at the first window and then deliver only a portion of the order at the second window. The distinction turns on whether the University is willing and able to provide the service and the student just elects not to accept it, or whether the University does not provide the service at all. If a party could contractually excuse itself from liability for non-performance, every contract of adhesion in America would do so.

Defendant's reliance on these disclaimers suffers from additional fatal flaws: all lack the consideration or specificity necessary to be considered binding contractual terms. The disclaimers purport to grant Defendant unfettered discretion to modify the contract without repercussion. It is black letter law that such a provision is illusory and, therefore, not enforceable. *See*, *e.g.*, *Harris v. Blockbuster Inc.*, 622 F. Supp. 2d 396 (N.D. Tex. 2009) (holding terms and conditions agreement stating "Blockbuster may at any time, and at its sole discretion, modify these Terms and Conditions of Use, including without limitation the Privacy Policy, with or without notice. Such modifications will be effective immediately upon posting" illusory and unenforceable.). While a party to a contract may contractually reserve the right to modify certain specified terms upon the occurrence

15

of certain specified factors, a provision purporting to give one party the right to unilaterally modify, breach, or cancel the contract for any reason or no reason at all is plainly unenforceable.

Likewise, these provisions lack specificity. Although Defendant contends that it "necessarily [implies] the right to shift the method of instruction" (MTD at 12), the statement itself makes no such reservation, much less the reservation to do so in the middle of the semester while evicting students from campus and retaining their pre-paid tuition and fees. Any ambiguity in the reservation of rights must be resolved in the favor of Plaintiffs, not given the "implication" urged by the drafter. Defendant had the opportunity to explicitly state whatever reading it now asks the Court to infer, and it failed to do so.

In any event, as the district court stated in denying the motion to dismiss in *Rothberg v. Xerox Corp.*, the "limited disclaimer(s) cited by the defendant in this case may have been superseded by other documentation or other representations relied upon by the plaintiff, as alleged in the Complaint." No. CV 12-617 (BAH), 2013 WL 12084543, at *4 (D.D.C. Jan. 4, 2013). The court explained that "[a]lthough the defendant attempts to frame its written disclaimers as a categorical bastion against the formation of any contractual understanding, communications by the defendant were "'rationally at odds' with its written disclaimers" and so had "the potential to create contractual obligations." *Id.* Indeed, a "disclaimer is not automatically effective and must be read in the context of the totality of the circumstances, including the parties' norms, conduct and expectations." *Id.* Here, Plaintiffs allege that they did not expect that the core contractual promise of an in-person on-campus education was subject to change." Consol. Compl. ¶¶ 48-60.

In short, the reservation of rights is not an enforceable term of the contract at issue in this case.   Neither does Defendant's attempt to modify the contract mid-semester meet the legal elements required for modification.

## II.   PLAINTIFF DOES NOT ALLEGE EDUCATIONAL MALPRACTICE

In a final attempt to escape responsibility from this straightforward contract action, Defendant argues that educational institutions are automatically entitled to great deference and/or subject to their own special set of rules.   This is simply not the law with respect to a university's commercial activities; here, selling an in-person, on-campus education to consumers.   While it is true that such deference is due in certain instances, this deference does not apply to any and all actions that may ever be brought against such an institution.   Colleges and universities do not get special treatment with respect to commercial transactions in the marketplace.

Defendant attempts to recast Plaintiff's allegations as claims of "educational malpractice," which it argues are not viable under D.C. law.   MTD at 14.   A claim for educational malpractice is one that sounds in tort and alleges that a school failed to provide an effective education.   Thus, an educational malpractice claim is one that "amounts to a general allegation of lack of quality education, without more." *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 404 (1992).   Accordingly, Courts have divided contract actions pursued by students against universities into two categories. One category—addressing inquiries into educational processes and pedagogy—affords substantial deference to universities.   The other category—involving breach of promises to provide specific educational services—does not. This case falls into the second category, and Plaintiffs' claims should be upheld as a result.

Generally, courts in D.C. "will not intervene in disputes between student and university about the quality or value of the education that has been provided." *Brantley v. D.C.*, 640 A.2d 181, 183 (D.C. 1994).   These types of claims involve such issues as faculty hiring, student

discipline, student assessment, and other highly specialized subjects of a purely academic nature. The plethora of the remaining cases upon which Defendant relies fall into this category. These claims are not disallowed, but courts do generally afford the type of deference that Defendant's Memorandum requests *ad nauseum*. The rationale behind this is simple and well-reasoned.

> "When a school issues a diploma to one of its students, it certifies to society that the student is well-versed in all of the knowledge and skills required by his or her chosen profession. Thus, to ensure society's confidence in the qualifications of individuals who have graduated from a particular educational institution, 'it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis.'"

*Alden v. Georgetown Univ.*, 734 A.2d 1103, 1109 (D.C. 1999) (quoting *Olsson v. Board of Higher Ed.*, 49 N.Y.2d 408, 402 N.E.2d 1150, 1153 (1980)). As a result, the national consensus is "[w]hen judges are asked to review the substance of a genuinely academic decision ... they should show great respect for the faculty's professional judgment." *Swartley v. Hoffner*, 734 A.2d 915, 921 (Pa. Super. Ct. 1999) (quoting *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985)) (emphasis added). Generally, courts will not intervene in such cases absent a showing of bad faith or arbitrary and capricious conduct. This deference, however, is not applicable to situations involving non-academic decisions or decisions not involving determinations requiring the special expertise of educators, such as the present case. This distinction is often confused by parties to litigation such as Defendant. As the New York Court of Appeals noted, in describing the distinction between standards of deference, "when urged in academic achievement as distinct from nonacademic matters the contract tends to be limited to the implied in law condition of good faith, i.e., not to act arbitrarily…[there is] ultimate confusion of the rules applicable in the two situations." *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 659 (1980).

Many of the cases cited by Defendants are distinguishable because they arose in the context of academic decision-making about academic performance or conduct. *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1108 (D.C. 1999) affirmed dismissal of a breach of contract claim brought by medical student expelled for "poor academic performance," because "a judgment by school officials that a student has not performed adequately to meet the school's academic standards is a determination that usually calls for judicial deference." *Allworth v. Howard Univ.*, 890 A.2d 194, 196, 202 (D.C. 2006) affirmed summary judgment on a claim brought by professor denied tenure by university for "weak research productivity," because courts should "rarely assume academic oversight" in "such sensitive areas as faculty appointment, promotion, and tenure"—but acknowledged that the "principle of academic freedom does not preclude the court from vindicating the contractual rights of a plaintiff who has been denied tenure in breach of an employment contract."

Defendant's other cases are also inapposite. *Brantley v. Dist. Of Columbia* 640 A.2d 181, 181-82 (D.C. 1994) dealt not with a contract claim, but rather with the failure of a school to "evaluate [the plaintiff's] learning disabilities in proper and timely fashion, as required by applicable regulation, and that they consequently failed to place her promptly in an appropriate school setting." In *Roe v. Saint Louis Univ.*, No. 4:08CV1474 HEA, 2012 WL 6757558, at *10-11 (E.D. Mo. Dec. 31, 2012), aff'd., 746 F.3d 874 (8th Cir. 2014) the court granted summary judgment against a student plaintiff's intentional misrepresentation, false promise and negligent misrepresentation, and deceptive merchandising practices claims because the claims would require the court to "inquire into the nuances" of such vague terms as "holistic wellbeing" and "what should be determined a 'state of the art physical training program.'" Meanwhile, the *Roe* court declined to apply educational malpractice doctrine to the plaintiff's contract claims, instead

granting summary judgment because "plaintiff has not provided any detail regarding which specific terms Defendant allegedly breached," and because "[p]olicy manuals and NCAA guidelines documents do not constitute a contract." *Id.* at 11.  Similarly, in *McClean v. Duke Univ.*, 376 F. Supp. 3d 585, 607 (M.D.N.C. 2019), the plaintiff "identified no specific promise related to counselling or any other gender violence support services."  Here, Plaintiff has provided detail regarding which specific promises Defendants allegedly breached.  Additionally, evaluation of whether in-person instruction and physical access to educational services was provided in accordance with Plaintiff and Defendant's contract does not require any "inquiry into nuances," as such a distinction it is facially apparent. As the *Roe* court states, "courts have recognized claims by students for breach of contract, fraud, or other intentional wrongdoing that allege a private or public educational institution has failed to provide specifically promised educational services." *Roe*, 2012 WL 6757558, at *10.

In contrast to the cases cited by Defendant, Plaintiffs' claims for breach of contract here are not based on a subjective difference in the educational value of online classes or the academic quality of those offerings. That is not what plaintiffs are asking the Court, nor should the Court accept Georgetown's attempt to rewrite Plaintiffs' Complaint.[4]  Rather, Plaintiff and Class Members' claims are based on Georgetown's failure to provide specific services that it promised and billed for: an on-campus education, complete with in-person, live instruction and access to campus facilities and resources.

---

[4] *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) (stating "[i]n our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.")

Where the breach of contract claim does not ask the court to consider highly specialized academic decisions or allege that that the school breached its agreement by failing to provide an effective education, but instead alleges failure to provide specified services, the action may be properly maintained.  The Seventh Circuit succinctly summarized the distinction as follows:

> To state a claim for breach of contract, the plaintiff must do more than simply allege that the education was not good enough.  Instead, he must point to an identifiable contractual promise that the defendant failed to honor.  Thus, as was suggested in [Paladino v. Adelphi Univ., 89 A.D.2d 85, 454 N.Y.S.2d 868 (1982)], if the defendant took tuition money and then provided no education, or alternatively, promised a set number of hours of instruction and then failed to deliver, a breach of contract action may be available. Similarly, a breach of contract action might exist if a student enrolled in a course explicitly promising instruction that would qualify him as a journeyman, but in which the fundamentals necessary to attain that skill were not even presented.  In these cases, the essence of the plaintiff's complaint would not be that the institution failed to perform adequately a promise of educational service, but rather that it failed to perform the service at all.

*Ross v. Creighton University*, 957 F.2d 410, 416-17 (7th Cir. 1992).[5]  The Seventh Circuit's decision in *Ross* shows why this case falls into the category where no deference is required, because Plaintiffs have pled breach of a contractual promise.  In *Ross*, the court explained that to "state a claim for breach of contract, the plaintiff must do more than simply allege that the education was not good enough." *Id.*  Instead, "he must point to an identifiable contractual promise that the defendant failed to honor." *Id.*  For example, if a university "promised a set number of hours of instruction and then failed to deliver, a breach of contract action may be available." *Id.* The Seventh Circuit explained that in such a case "the essence of the plaintiff's complaint would not be that the institution failed to perform adequately a promised educational service, but rather

---

[5] *Ross* was generally cited with approval by the D.C. Court of Appeals in *Brantley*, *supra.*

that it failed to perform that service at all." *Id.* Such a claim does not require any inquiry into the nuances of the education provided, but rather "an objective assessment" of whether the university performed on its promise. *Id.* As a result, the court held that an academically challenged student-athlete had properly alleged breach of a contract promising academic—assistance services that he claimed were not provided in exchange for attending the university. *Id.* (finding breach of contract claim cognizable where complaint alleged that "the University breached its promise by reneging on its commitment to provide [tutoring] services.")

Similarly, in *In re Antioch Univ.*, 418 A.2d 105, 112-13 (D.C. 1980), the D.C. Circuit sustained claims by student-intervenors in a case brought by law school co-deans against a university to gain control of the law school's funding from the trustees before it went bankrupt. The students properly "asserted their contractual rights to attend an institution accredited by the ABA and which maintains a teaching program as described in the law school brochure." *Id.* The court merely rejected the remedy the students sought (to interfere in the trustees' control of the university), and stated that instead the students must seek damages for the breach. *Id.* Accordingly, *Antioch* supports Plaintiffs' position here because it acknowledges that the University's failure to provide promised services give rise to breach of contract claims.

Courts across the country have found cognizable breach of contract claims where: an academically challenged student-athlete had been promised academic-assistance services in exchange for attending the university that he claimed were not provided, *Ross*, 957 F.2d at 416-17; a university "raised professional education fees for continuing students after promising on its website and in its catalogues that such fees would not be raised for the duration of the students' enrollment in the professional program," *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809 (Ct. App. 2007); a university may have "obligated itself to provide modern equipment in good

working condition, qualified instructors, and computer training for all students, but did not fulfill those obligations," *CenCor, Inc. v. Tolman,* 868 P.2d 396, 300 (Colo. 1994); a professor ceased teaching classes on May 1 despite the course set to conclude "with a final examination on or before June 2, 1970," the professor did not give a final examination, and the professor provided each student with a score of B for the course due to the professor's engagement in a faculty strike protest of American military involvement in Cambodia, *Zumbrun v. Univ. of S. Cal.,* 23 Cal. App. 3d 1, 7 & 10-11 (Ct. App. 1972); where "Yale failed to deliver on its express and implied contractual duties to safeguard students from academic misconduct, to investigate and deal with charges of academic misconduct, and to address charges of academic misconduct in accordance with its own procedures" that resulted in misappropriation of the plaintiff's idea by faculty, *Johnson v. Schmitz,* 119 F. Supp. 2d 90, 96 (D. Conn. 2000); and where university promised to provide state-of-the-art facilities and hands-on training, but allegedly failed to do so, *Ansari v. New York University*, 1997 WL 257473 (S.D.N.Y. 1997).

Just as in those cases, the Consolidated Complaint in the instant case does not allege a cause of action for educational malpractice, or involve highly specialized subjects of a purely academic nature. The Consolidated Complaint does not seek to challenge student disciplinary or assessment decisions. Nor do Plaintiffs take issue with the specific ways that individual professors elected to teach their classes once remote learning was mandated. Plaintiffs do not suggest, for example, that teachers should have used one video conferencing platform over another, or that the content of lesson plans should have been adjusted. Rather, Plaintiffs allege that they paid a large sum to Defendant for the purchase of an in-person, on-campus educational experience with multiple benefits, services, access and opportunities, and that Defendant, in breach of contract, did not provide that experience. Plaintiffs, like all parties to a contract, are entitled to receive the

benefit of the bargain.  The law does not permit Defendant—a university with billions of dollars— to refuse to issue appropriate refunds and insist that Plaintiffs (and other similarly-situated students) bear 100% of the loss resulting from Defendant's breach.

Defendant's opposition seems rooted in Defendant's incorrect understanding of Plaintiffs' claims.  Plaintiffs are not suing because they claim they received a lower quality education, although by all accounts, they did.  Instead, the CAC alleges that when students pay hundreds of thousands of dollars to enroll in schools perhaps hundreds or thousands of miles from their home, they are purchasing an on-campus educational experience with multiple appurtenant benefits, services, access and opportunities.  It is a bundle of sticks, and the actual quality of educational instruction is but one stick in the bundle.

While Defendant may dispute these allegations, it is abundantly clear that Plaintiffs' claims do not allege generalized educational malpractice or require any heightened judicial deference. Plaintiffs' allegations must be taken as true for purposes of the instant motion to dismiss, and accordingly, dismissal is not warranted.  Indeed, there are approximately 150 lawsuits currently pending throughout the country related to the failure of colleges and universities to provide appropriate refunds after switching to remote instruction during the spring of 2020.  Although Defendant characterizes these lawsuits as alleging "educational malpractice" and/or necessitating judicial deference, no court has yet to agree.  Instead, of the eight cases where these arguments have been advanced and fully adjudicated, all eight motions have been denied.  *See Salerno v. Fla. S. Coll.*, 2020 WL 5583522 at *4 (M.D. Fla. Sept. 16, 2020) (finding complaint sufficiently alleged "that the College's publications clearly implied that courses would be conducted in-person" and "underscore[ing] that this case is not about the quality of the College's education… This case is simply about an alleged promise to provide in-person learning that was allegedly breached.") (Ex.

24

A); *Milanov v. Univ. of Mich.*, Case No. 20-000056-MK, 2020 Mich. Ct. Cl. LEXIS 1, *8-9 (Ct. Cl. July 27, 2020) ("[Plaintiffs] are arguing that the university promised one method of instruction, charged tuition and fees commensurate with that method of instruction, yet provided a different (allegedly lesser) method of instruction. This is a claim potentially sounding in contract or in quasi-contract, not in due process" and "while [case law] describes a number of areas into which a Court should be hesitant to intrude, principles of contract and quasi-contract are not among those areas.") (Ex. B); *McDermott v. Ohio State Univ.*, No. 2020-00286JD, 2020 Ohio Misc. LEXIS 127, *5 (Ct. Cl. Aug. 24, 2020) ("Plaintiff's complaint does not merely assert that the education she received was substandard due to the clinic being closed. Rather, plaintiff alleges that defendant charged a fee specifically to support the dental clinic and then closed the clinic. That is sufficient to assert an unjust enrichment claim.") (Ex. C); *Cross v. Univ. of Toledo*, No. 2020-00274JD, 2020 Ohio Misc. LEXIS 121,  *7-8 (Ct. Cl. July 8, 2020) (Ex. D); *Mellowitz v. Ball State Univ. & Bd. of Trs. of Ball State Univ.*, 2020 Ind. Super. LEXIS 854, *1 (Marion Sup. Ct. Civil Div. 14 Aug. 12, 2020) (Ex. E); *Waitt v. Kent State Univ.,* 2020-00392JD (Oh. Ct. Cl. Sept. 28, 2020) at *3 ("Waitt's first amended class action complaint does not present a claim of 'educational malpractice' as KSU suggests.") (Ex. F); *Garland v. Western Michigan Univ.*, 20-0063-MK (Mi. Ct. Cl. Sept. 15, 2020) at *7 ("the Court disagrees that plaintiff's complaint asks the Court to interfere with WMU's academic autonomy…") (Ex. G); *Smith v. The Ohio State Univ.,* 2020-00321JD (Oh. Ct. Cl. Sept. 9, 2020) at *3 ("Plaintiff alleges that when she paid tuition to defendant a contract was created and that by holding classes virtually and not refunding a portion of the previously paid tuition and fees, defendant breached said contract…The mere mention of possible consequences to plaintiff's educational or professional future does not render plaintiff's complaint a claim for educational malpractice.") (Ex. H).

Plaintiffs are not aware of any tuition and fee refund cases across the country that have been dismissed as improper educational malpractice actions or on the grounds of "judicial deference."  Finding no support for its position in the above cases (involving nearly identical facts and allegations to the present case), Defendant instead relies upon a 40-year-old case arising out of the small claims court of New York, *Paynter v. New York University*, 319 N.Y.S.2d 893 (N.Y. App. Div. 1971).  This reliance is equally misplaced.  In *Paynter*, classes were suspended on May 7, 1970 until the examination period after the tragic shooting at Kent State University.  The First Department reversed a judgment by the small claims court that held the University was altogether unjustified in cancelling the classes, which is not the issue here. The reversal was a mere two paragraphs and was issued, it seems, in response to a lengthy opinion by the small claims court that could only be described as a misplaced educational manifesto.  In denying relief, the court explained that this "***insubstantial change*** made in the schedule of classes does not permit a recovery of tuition." *Id*. at 894 (emphasis added).

Furthermore, *Paynter* was a reversal of a judgement awarding a tuition refund, not an order granting a motion to dismiss. As explained by the California appellate court analyzing *Paynter*, "whether the partial failure of consideration was minimal so as to render applicable the maxim 'de minimis non curat lex' or whether it justifies refund of a portion of the tuition and fee allocable to the course is a matter of proof, under the present state of the pleadings, at trial in an appropriate forum." *Zumbrun,* 101 Cal. Rptr. at 505.  Thus, *Paynter* supports Plaintiffs' position that this case should be heard on the merits.  In any event, it is distinguishable in that it involved a suspension of a few days of courses not a half a semester's worth of courses.

In sum, the deference granted to educational institutions in certain matters is not as broad or all-encompassing as Defendant contends.  Instead, such deference is granted only in cases

involving highly specialized academic judgments.  The decision to retain monies paid for products and services that were never delivered is a standard commercial business decision, and one encountered by all market participants who take money in return for the promise to deliver services and/or products.  Defendant's decision to retain such monies in this case was not academic in nature and clearly not a highly specialized academic judgment.  Thus, Plaintiff's claims do not rise in educational malpractice, and no special deference is afforded to Defendant.

## III.    PLAINTIFF STATES A CLAIM FOR UNJUST ENRICHMENT

Defendant argues that Plaintiffs' unjust enrichment claim should be dismissed because it duplicates their breach of contract claim, because an unjust enrichment claim may not lie where an express contract exists, and that Plaintiffs have not plausibly alleged unjust enrichment.  Motion at 18.  Defendant is wrong on both fronts. .

### A.    Plaintiff May Plead A Claim For Unjust Enrichment In The Alternative

Defendant first incorrectly argues that "since plaintiffs allege an express or implied contract, their unjust enrichment claim cannot proceed." MTD at 18.  This argument fails for two reasons.  First, Defendant ignores the plain reading of Rule 8(d)(3), which allows for pleading in the alternative, including unjust enrichment claims.  See *Salerno*, 2020 WL 5583522, at *1 (rejecting argument that unjust enrichment claim was improper: "Regardless of whether a contract exists, the College disputes the merits of the breach of contract claim.  Even more important, this Court has consistently held that a plaintiff may allege alternative claims in her complaint.").  Similarly, in *Rothberg,* the plaintiff employee sued his employer for failing to pay promised commissions on completed sales.[6]  The defendant argued that the unjust enrichment claim "must

---

[6] *Rothberg*, 2013 WL 12084543, at *1

fail because the plaintiff incorporates his contract claim allegations."[7]   The court acknowledged that restitution on an unjust enrichment claim is not available "when there is an actual contract between the parties."[8]  "Yet, the plaintiff can "properly plead alternative theories of liability, regardless of whether such theories [are] consistent with one another."[9]  The court denied a motion to dismiss breach of contract and unjust enrichment claims.[10]  This court should do the same.

Second, the existence of a contract alone does not foreclose a recovery under unjust enrichment.  Instead, unjust enrichment claims will fail where there is a valid and enforceable contract that actually governs the issue in dispute.  An otherwise existing "contract" might be invalid where, for example, there is a lack of consideration.  Likewise, an otherwise valid contract might not address the issue in dispute or might be unenforceable under common law avoidance doctrines.  The merits of any affirmative defenses Defendant may raise are fact intensive and not appropriate for discussion at this stage.  But the possibility that Defendant asserts these defenses in the future remains.  If the finder of fact (or the Court at a later stage) finds that Defendant's performance was excused, Plaintiffs' claims for equitable relief are not only viable but appropriate.  Indeed, in the cases of impossibility, impracticability, and frustration of purpose, both parties are excused from performance and the law seeks to restore both parties to their pre-contract position.  In a case such as this, where Plaintiffs have already performed (by paying tuition and fees), equitable disgorgement must accomplish this result.  As the District of Columbia Court of Appeals

---

[7] *Id.* at *6
[8] *Id.*
[9] *Id.* (citing *Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996) and Rule 8) *See also Baker v. Capital City Mortg. Corp..*, No. CV 09-2202 (RBW), 2011 WL 13244133, *4 n.2 (D.D.C. Dec. 28, 2011) (deferring ruling "on whether the unjust enrichment claim must be dismissed until the presentation of the evidence" on the contract claim).
[10] *Rothberg*, 2013 WL 12084543, at *8

aptly noted:

> Judicial statements to the effect that "there can be no unjust enrichment in contract cases" can be misleading if taken casually. Restitution claims of great practical significance arise in a contractual context, but they occur at the margins, when a valuable performance has been rendered under a contract that is invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations. Applied to any such circumstance, the statement that there can be no unjust enrichment in contract cases is plainly erroneous.

*Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016).

In time, this case will resolve as a breach of contract action or an unjust enrichment action, and not both. However, that point is not now. Until such evidence is gathered (outside of the four corners of pleadings) to allow the Court or trier of fact to establish the existence and enforceability of a contract, Plaintiffs' claims for unjust enrichment can and must be maintained. See *Salerno*, 2020 WL 5583522, at *5 (denying defendant's motion to dismiss claims of unjust enrichment pled in the alternative to breach of contract in the context of another university's shutdown during the COVID-19 pandemic).

Next, Georgetown erroneously argues that Plaintiffs cannot plead an alternative claim of unjust enrichment. MTD at 18. That is plainly wrong. Plaintiffs are masters of their Complaint and can certainly choose, as plaintiffs often do, to bring both claims.[11] Defendants, in their Motion do not dispute the existence of an enforceable contract covering the subject matter, claiming "the only dispute is its [*sic*] over terms". MTD at 18. However, if the University can choose to disregard such a core obligation as the provision of in-person on-campus education, then Plaintiffs'

---

[11] *See e.g. Rothberg*, 2013 WL 12084543, at *8

29

alleged contracts with Georgetown are clearly illusory and unenforceable, and an unjust enrichment claim may proceed.[12]

### B.    Plaintiff Sufficiently Pleads The Elements Of Unjust Enrichment

Not only are Plaintiffs permitted to plead unjust enrichment in the alternative to their contract claims, but they have done so plausibly.  "'Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust.'" *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 82 F. Supp. 3d 344, 357 (D.D.C. 2015) (citing *Bregman v. Perles*, 747 F.3d 873, 876 (D.C. Cir. 2014)).  In other words, "[a] claim for 'unjust enrichment' may be asserted when one party receives a benefit from another under circumstances that make it inequitable for the defendant to retain the benefit without the payment of its value." *ABA, Inc. v. D.C.*, 40 F. Supp. 3d 153, 172 (D.D.C. 2014) (citing *Kramer Assoc., Inc. v. Ikam, Ltd.,* 888 A.2d 247, 254 (D.C. 2005)).

Here, Plaintiffs have pled they conferred a benefit upon Defendant by paying tuition and fees for the Spring 2020 semester. Consol. Compl. ¶¶ 19-20 & 63.  Plaintiffs have further pled that Defendant has accepted and retained the benefit.  *See* Consol. Compl. ¶¶ 16, 21, 64.  Defendant does not appear to contest this.  Rather, Defendant argues that their retention was not unjust or inequitable.  MTD at 18-19.  This is a premature factual argument, as the Consol. Compl. alleges that the retention was unjust.  Consol. Compl. ¶¶ 65-66.  Expecting students (most of whom have incurred substantial debt in order to finance their purchases from Defendant) to continue to pay

---

[12] *See Davis v. Joseph J. Magnolia, Inc.*, 640 F. Supp. 2d 38, 45 (D.D.C. 2009) ("A contract lacks consideration when one party's promise is illusory, and a promise is illusory when performance of that promise is optional.") (citing Restatement (Second) of Contracts § 77 (1981)).

for 100% of the products, programs, access, and services that were never provided is the inequity here.

Defendant's reliance on *Roe v. Loyola Univ. New Orleans*, 2007 WL 4219174 (E.D. La. Nov. 26, 2007) to support its argument on this point is misplaced as *Loyola* is not analogous to the present case.   In *Loyola*, the university provided *the option* for its students to attend other accredited law schools as visiting students (in-person and on-campus) during the aftermath of Hurricane Katrina without paying tuition to those schools, so long as they paid tuition to Loyola.  *Id*. at *2-3.  In dismissing Roe's unjust enrichment claim, the court explained "[p]laintiff has pointed to no provision…that would entitle him to a free semester of law school.  Rather, by attending classes during the Fall 2005 semester at SMU, plaintiff received the benefit of the emergency policy made possible by Loyola."  *Id.*, at *5-6.  The unjust enrichment claim failed because "if he hadn't paid tuition to Loyola, he would have been required to pay SMU's tuition, which was more expensive than that of Loyola."  *Id*. at *7.  Contrasting to the situation at hand, Plaintiffs were not given an option when Defendant shut down its campus mid-semester—they were forced to either accept a product that was not bargained for (online education) or receive no education at all and forfeit the tuition and fees they had already paid in full.  This Hobson's choice was no option at all.  Moreover, Plaintiffs are not seeking a tuition-free semester as was the Plaintiff in *Loyola*; they only seek a prorated refund based on the difference between tuition for on-campus and online courses, as well as a prorated refund of the fees for access and services for which they did not receive the benefit.

As a result of the closure of campus, Defendant saved significant sums of money in the way of reduced utility costs, reduced maintenance and staffing requirements, reduced or eliminated hours for hourly employees, etc.  At the same time, Defendant received a significant bailout from

the Federal Government under the CARES Act.  All the while, Defendant is supported by a nearly 1.7-billion-dollar endowment while its students are incurring debt to pay the very fees and tuition Defendant seeks to retain.  This is a textbook example of an unjust and inequitable arrangement and Plaintiffs' claims for unjust enrichment should not be dismissed.

Lastly, Defendant argues that "Plaintiffs' unjust enrichment claim should be dismissed under D.C. law foreclosing claims again [*sic*] a university's academic decision-making."  MTD at 19.  As discussed *supra*, this argument is without merit.

## IV.    PLAINTIFFS STATE A CLAIM FOR MONEY HAD AND RECEIVED

"[T]he law of the District of Columbia makes no distinction between actions for unjust enrichment and for money had and received." *Delaware, Dep't of Health & Social Serv., Div. of Medicaid & Medical Assistance v. U.S. Dep't of Health & Human Serv.*, 272 F. Supp. 3d 103, 114 (D.D.C. 2017); *See also Chase Manhattan Bank v. Burden*, 489 A.2d 494, 497 n.8 (D.C. 1985) (The two causes of action "are essentially the same").  As discussed *supra*, plaintiffs have adequately stated a claim for unjust enrichment.  It thus follows that plaintiffs have adequately stated a claim for money had and received.  Consol. Compl. ¶¶ 75-82.  Plaintiffs' claim for money had and received should be upheld for the same reasons as their unjust enrichment claim.

## V.     PLAINTIFFS STATE A CLAIM FOR CONVERSION

To state a claim for conversion under D.C. law, a plaintiff must allege "'(1) an unlawful exercise, (2) of ownership, dominion, or control, (3) over the personal property of another, (4) in denial or repudiation of that person's rights thereto.'"  *Johnson v. McCool*, 808 F. Supp. 2d 304, 308 (D.D.C. 2011) (quoting *Gov't of Rwanda v. Rwanda Working Grp.*, 227 F. Supp. 2d 45, 62 (D.D.C. 2002)); *see also Baltimore v. District of Columbia*, 10 A.3d 1141, 1155 (D.C. 2011).  "[W]here the defendant's initial possession is lawful, the settled rule is that it [sic] the absence of other facts and circumstances independently establishing conversion, a demand for its return is

necessary to render his possession unlawful and to show its adverse nature." *Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956) (footnote omitted).  Plaintiffs have pled each of these elements by alleging that Defendant wrongfully retained and refused to refund their tuition and fees.  Consol. Compl. ¶¶ 67-74.

Each of Defendant's four attacks on Plaintiffs' conversion claim are meritless.  First, "'[m]oney can be the subject of a conversion claim if the plaintiff has the right to a specific identifiable fund of money.'" *McNamara v. Picken*, 950 F. Supp. 2d 193, 194 (D.D.C. 2013) (quoting *Cannon v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 152, 176 (D.D.C. 2013)).  *See also Bucheit v. PLO,* 2003 U.S. Dist. LEXIS 26002, *18 (D.D.C. Aug. 15, 2003). Plaintiffs have identified the specific sums of money that were converted, namely the tuition and fees they paid for the Spring 2020 semester.  Consol. Compl. ¶¶ 11, 17, 19-20, 71-72; *see Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 44 (D.D.C. 2019) (holding that where plaintiff alleged that defendant had wrongfully charged and retained an additional 4.95% over and above the premium for her insurance policy, "this rationale sufficiently alleges a right to a specific, identifiable source of money.").  Accordingly, their claim is not one for a "general obligation to pay money" or an "unspecified, unidentified, portion of a larger oil of funds" and is actionable as a conversion claim. *See* MTD at 20, citing *Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 31 (D.D.C. 2014).

*Rwanda v. Rwanda Working Group*, 227 F. Supp. 2d 45 (D.D.C. 2002) is directly on point. In that case, a contractual relationship existed between the plaintiff and the defendant, which required the plaintiff to pay the defendant a specific sum of money for work that would then be performed on behalf of the plaintiff.  *Id*. at 50, 63. The plaintiff paid the defendant $28,000 and $55,000 as specified in two separate contracts, however, the defendant failed to use the funds in a

33

manner that would benefit the plaintiff as anticipated by the terms of the contracts.  *Id*.  The plaintiff therefore demanded that the defendant return the money that was paid to him pursuant to the contracts.  *Id*.  Because the defendant had received a specific identifiable sum of money from the plaintiffs, did not perform the services required by the contract, and did not return the money when requested to do so by the plaintiffs, the court held that the defendant unlawfully converted the plaintiff's money.  *Id*.  Here there was a contract between Plaintiffs and the University under which the University promised to provide in-person education and activities, for which Plaintiffs paid specific sums of money.  Consol. Compl. ¶ 4-11, 22-23, 37-38, 69.   Defendant failed to use the funds to provide in-person learning and activities as promised in the contract and refused to return the money paid by Plaintiffs.  Consol. Compl. ¶ 70.  Accordingly, as in *Rwanda*, Plaintiffs have stated a claim for conversion.

The cases relied upon by Defendant are inapposite.  In *McNamara,* 950 F. Supp. 2d 193, plaintiff alleged that money contributed to a partnership was wrongfully used to pay off defendant's personal debts.  *Id*. at 194.  The court determined that plaintiff had not stated a claim for conversion with regard to general partnership funds, which were derived in part from services he provided, because he had not established that a specific amount of funds that he had personally contributed were misdirected.  *Id*. at 195.  However, the court held that plaintiff *had* stated a claim for conversion with regard to a check for a specific amount of money which plaintiff had contributed to the partnership.  *Id*.  Like the check in *McNamara*, Plaintiffs' tuition and fees are a specific, quantifiable amount of money which the University misdirected to online classes rather than the promised and bargained-for in-person learning.

*Campbell v. Nat'l Union Fire Ins. Co.*, 130 F. Supp. 3d 236 (D.D.C. 2013) is similarly unhelpful to Defendant's position.   In *Campbell*, plaintiff alleged that her insurance company had

overcharged her on her premiums.  The court held that a conversion claim could not lie because, among other things, overcharges on a credit card did not constitute specific, identifiable sums of money that were segregated for a specific purpose.  *Id.* at 259.  Here by contrast, Plaintiffs' tuition and fees are not merely debts upon which they are owed a refund.  They are specific sums of money which were paid and earmarked for the specific purpose of providing in-person educational opportunities and on-campus activities.  Consol. Compl. ¶¶ 3-11, 22-23, 37-38, 69.

Second, Plaintiffs' conversion claim is not predicated merely on their rights under their contract with the University.  While the breach of contract claim is based on Defendant's broken promise to provide in-person teaching and access to certain facilities, the conversion claim is based on an independent harm, namely, Defendant's wrongful retention of the tuition and fees Plaintiffs paid.  Because the conversion claim is not based merely on Defendant's failure to fulfill its contractual obligations it can lie alongside the breach of contract claim and is not duplicative.  *See Rwanda,* 227 F. Supp. 2d at 63 (defendant held liable for conversion even though the monies were paid pursuant to contract because defendant did not perform the services as required and failed to return the monies upon demand); *Sloan v. Urban Title Servs.*, 2011 U.S. Dist. LEXIS 31225, *26 (D.D.C. Mar. 27, 2011) (finding that plaintiff's claim for conversion could lie because her allegations extended beyond mere enforcement of a contractual obligation); *Sabre Int'l Sec. v. Torres Advanced Enter. Solutions, LLC*, 13 F. Supp. 3d 62, 72 (D.D.C. 2014) ("[Plaintiff] is not recasting a contract claim as one for conversion; its allegations give rise to a claim for conversion independent of any contract remedies it may also have.").

And, even if the conversion and breach of contract claims were duplicative (which they are not), Plaintiffs are permitted to plead such claims in the alternative. *See Nevius v. Afr. Inland Mission Int'l,* 511 F. Supp. 2d 114, 122 (D.D.C. 2007) (permitting plaintiff to plead breach of

contract and unjust enrichment in the alternative); *McNamara,* 950 F. Supp. 2d at 128 ("a plaintiff 'need not use particular words to plead in the alternative as long as it can be reasonably inferred that this is what [it was] doing.'") (quoting G-*I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 536-37 (S.D.N.Y. 2002); *see also* Fed. R. Civ. P. 8(e)(2) (permitting pleading in the alternative).  This is especially true where, as here, Defendant denies the very existence of a contractual obligation to Plaintiffs.  *See Busby v. Capital One, N.A.,* 932 F. Supp. 2d 114, 145 (D.D.C. 2013) ("because [defendant] in fact disclaims the existence of any contractual relationship with Capital One, a conversion claim is not unfitting.").

Third, Plaintiffs have adequately alleged that Defendant diverted their funds "in denial or repudiation of [Plaintiff's] right to" the disputed property, namely the tuition and fees they paid for the Spring 2020 semester.  *See* MTD at 21, quoting *Shulman v. Voyou, LLC*, 251 F. Supp. 166, 170 (D.D.C. 2003).  Contrary to Defendant's argument, the University did not use Plaintiffs' tuition or fees for their "intended purpose."  As evidenced by Defendant's website, marketing materials, advertisements, and other literature, the intended purpose of Plaintiffs' tuition was in-person instruction and the on-campus experiences.  *See* Consol. Compl. ¶¶ 3-11, 22-23, 37-38.  Similarly, the mandatory fees paid by Plaintiffs and their classmates were specifically intended to pay for on-campus activities, intra-campus transportation, and access to campus facilities and equipment.  *See* Consol. Compl. ¶¶ 10.  The University diverted Plaintiffs' tuition and fees away from the bargained-for in-person learning and activities to online learning.  Nor is Plaintiffs' choice to continue the semester online rather than simply drop out inconsistent with their claim for conversion.  Defendants failure to provide a refund of Plaintiffs' tuition and fees forced Plaintiffs to choose between an online education at full price or no education at all.  By taking online classes, Plaintiffs received an education, but not the one that they were promised and paid for.  Plaintiffs

have thus stated a claim for the difference between the value of the in-person education they and the University agreed to and the online education they received.

Finally, for the reasons set forth in Section II., *supra*, Plaintiffs' conversion claim, like its claims for breach of contract and unjust enrichment, are not claims of educational malpractice. Plaintiffs have not asked the Court to sit in review of the day-to-day implementation of the educational policies, but to remedy that Defendant's refusal to refund Plaintiffs tuition and fees which they were induced to pay based on the University's unfulfilled promise of in-person educational services, opportunities, and experiences.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss in its entirety.

Dated: October 26, 2020

Respectfully submitted,

By:        */s/ Philip L. Fraietta*

Philip L. Fraietta

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (*Pro hac vice*)
Joseph I Marchese (*Pro hac vice*)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 959-9163
pfraietta@bursor.com
jmarchese@bursor.com

Sarah N. Westcot *(Pro hac vice)*
2665 S. Bayshore Drive, Suite 220
Miami, FL 33133
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

37

**THE SULTZER LAW GROUP P.C.**
Jason P. Sultzer, Esq. (*Pro hac vice* forthcoming*)*
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Telephone: (845) 483-7100
sultzerj@thesultzerlawgroup.com

**NIDEL & NACE PLLC**
Jonathan Nace
2201 Wisconson Ave., NW, Suite 200
Washington, DC 20007
202-780-5153

**LEEDS BROWN LAW, P.C.**
Jeffrey K. Brown (*Pro hac vice* forthcoming)
Michael A. Tompkins (*Pro hac vice* forthcoming)
Brett R. Cohen (*Pro hac vice* forthcoming)
1 Old Country Road, Suite 347
Carle Place, NY 11514
516.873.9550
jbrown@leedsbrownlaw.com
mtompkins@leedsbrownlaw.com
bcohen@leedsbrownlaw.com

*Plaintiffs' Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Phillip L. Fraietta, hereby certify that on October 26, 2020 a true and correct copy of Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss Plaintiffs' Consolidated Complaint was served via the Court's electronic filing system to all counsel of record.

<i>/s/ Philip L. Fraietta</i><br>Philip L. Fraietta

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DARIA CRAWFORD and AHMED ABDELHAMID, individually and on behalf of others similarly situated**, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civ. Action Nos. 1:20-cv-01539-CRC 1:20-cv-01886-CRC |
| **THE PRESIDENTS AND DIRECTORS OF GEORGETOWN COLLEGE,** | ) ) ) ) | |
| *Defendant.* | ) | |

## [PROPOSED] ORDER

UPON CONSIDERATION of Defendant's Motion to Dismiss, any opposition thereto, and the entire record herein, it is on this ___ day of _____, 2020 hereby

ORDERED that Defendant's motion is DENIED.

SO ORDERED.

_____
Honorable Christopher R. Cooper
Judge for the United States District
Court for the District of Columbia

1